S99A0009. QUIJANO v. THE STATE.
(516 SE2d 81)

CARLEY, Justice.

A jury found Eugene Cadavillo Quijano guilty of malice murder and, in the alternative, guilty of felony murder while in the commission of an armed robbery and aggravated assault. The trial court entered a judgment of conviction and life sentence for malice murder, and the alternative felony murder count was vacated by operation of

OCGA § 16-1-7. *Malcolm v. State*, 263 Ga. 369, 372 (5) (434 SE2d 479) (1993). The trial court denied Quijano's motion for new trial, and he appeals.[1]

1. The victim was Amanda Puckett, a teenager who was working alone in her mother's jewelry store when she was shot and killed. Ms. Kyong Cha Brooks, who was working next door, heard a loud noise coming from the jewelry store and went to investigate. She arrived to see a man pulling the victim's body across the floor. This man looked directly at Ms. Brooks and told her to enter the store. At trial, Ms. Brooks identified the man as Quijano. Two men responding to Ms. Brooks' screams saw a man running towards and then fleeing in a white Isuzu Rodeo with Olympic license plates, but they could not positively identify Quijano as that man. However, several other eyewitnesses did testify that he was the man they saw leaving the scene of the murder in the Isuzu. Yet another eyewitness identified Quijano from a photographic lineup. His hand and fingerprints were discovered on one of the jewelry store's glass cases, which had been cleaned shortly before the murder. Quijano owned a white Isuzu Rodeo with Olympic license plates. On the night of the murder, Quijano's daughter-in-law saw her husband remove a handgun from a safe in her father-in-law's bedroom. Later that same night, Quijano fled to Mexico and, in the following days, his son and father disposed of the gun. Shortly thereafter, the Quijano family moved to Seattle, and he joined them there. Eventually, however, the entire family moved back to the Atlanta area. After their return to Georgia, Quijano's daughter-in-law told a friend, whose father was a police detective, what she had observed on the night of the murder. Quijano was arrested. The police questioned his wife, who had been out of the country at the time of the murder, and she informed them that Quijano admitted to her that he went to the jewelry store to rob it and that he accidentally pulled the trigger on the gun. This evidence is sufficient to authorize a rational trier of fact to find proof beyond a reasonable doubt that Quijano was guilty of malice murder. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Defense counsel overheard Mr. Corneau, one of the State's eyewitnesses who had yet to testify, discussing the case with Mr. Asker, another eyewitness for the State who had already testified. Outside of the presence of the jury, Mr. Corneau was questioned about the

---

[1] The murder was committed on June 29, 1994 and the grand jury indicted Quijano for that crime on August 10, 1995. The jury found Quijano guilty on October 9, 1996 and, on that same day, the trial court entered the judgment of conviction and life sentence. Quijano filed his motion for new trial on October 10, 1996 and the trial court denied that motion on August 13, 1998. Quijano filed his notice of appeal on August 26, 1998 and the case was docketed in this Court on September 22, 1998. Oral argument was heard on February 8, 1999.

conversation and he testified that, although he had related what he saw to Mr. Asker, Mr. Asker did not recount to him any facts relative to the murder. Thus, according to Mr. Corneau, the conversation would not influence his testimony, because his knowledge of the facts regarding the crime was not attributable to anything said by Mr. Asker. The trial court permitted Mr. Corneau to testify, over Quijano's objection that the violation of the rule of sequestration was disqualifying.

The purpose of the rule of sequestration is to ensure that the testimony of a witness who has yet to testify is not influenced by that of another witness. *Childress v. State*, 266 Ga. 425, 431 (2) (467 SE2d 865) (1996). However, a violation of the rule does not automatically render a witness incompetent to testify. *Hicks v. State*, 256 Ga. 715, 719 (12) (352 SE2d 762) (1987). Generally, a violation does not affect the admissibility of testimony, but may impact the offending witness's credibility. *Childress v. State*, supra at 431 (2). Where, as here, the improper communication occurs outside the courtroom, the appropriate remedy is for the trial court to admit the testimony and, if requested by opposing counsel, to charge the jury that it can consider the violation in assessing the witness's credibility. *Childress v. State*, supra at 432 (2). Since nothing in the transcript contradicts Mr. Corneau's assurance that the conversation with Mr. Asker would not influence his testimony, the trial court did not abuse its discretion by permitting him to testify. Quijano did not request that the trial court charge the jury with regard to the violation and its possible effect on the credibility of Mr. Corneau's testimony, and the trial court was not required to give such a charge sua sponte. See *Bradford v. State*, 182 Ga. App. 337, 339 (6) (355 SE2d 735) (1987).

3. Quijano urges that the State's unduly suggestive pre-trial procedures caused the in-court identification testimony of both Ms. Brooks and Mr. Corneau to be inadmissible. Insofar as Ms. Brooks is concerned, however, she testified that, because of her fear and shock, she was unable to identify any of the men depicted in the allegedly suggestive photo lineup shown to her before trial. Instead, her only identification of Quijano was made in court. The basis for that identification was her face-to-face confrontation with the murderer and her observations as he fled the scene. The failure of Ms. Brooks to make a pre-trial identification would not require the trial court to strike her in-court identification of Quijano as the man she saw. *Ralston v. State*, 251 Ga. 682, 684 (2) (309 SE2d 135) (1983). Because Ms. Brooks had ample opportunity to observe the perpetrator and the allegedly suggestive pre-trial photo lineup did not affect her testimony, the trial court properly allowed her in-court identification of Quijano.

"Convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. [Cits.] . . ." [Cit.] "Moreover, '(e)ven if a pretrial identification is tainted, an in-court identification is not constitutionally inadmissible if it does not depend upon the prior identification but has an independent origin. (Cit.)' [Cit.] . . ." [Cit.]

*Futch v. State*, 192 Ga. App. 345, 346 (385 SE2d 18) (1989).

Mr. Corneau also testified that he based his in-court identification testimony upon his own observations, and he was quite certain that Quijano was the man he saw on the day of the murder. Therefore, even assuming, without deciding, that a photographic lineup which Mr. Corneau viewed before trial was suggestive, his in-court identification testimony still was admissible. *Futch v. State*, supra.

4. At trial, Quijano's wife refused to testify against him. When the State sought to introduce his wife's out-of-court statement containing the reference to his inculpatory admission, Quijano raised a hearsay objection. The trial court held that the statement was admissible pursuant to the "necessity" hearsay exception. Quijano enumerates this evidentiary ruling as error.

Under the hearsay exception recognized in OCGA 24-3-1 (b), an out-of-court statement can be admitted when it is both "necessary" to do so and the statement itself evidences a guarantee of sufficient "trustworthiness." *Drane v. State*, 265 Ga. 663, 664 (1) (461 SE2d 224) (1995). Here, it was necessary for the State to seek admission of Ms. Quijano's statement when the prosecution could not call her as a witness because she invoked the marital privilege. *Higgs v. State*, 256 Ga. 606, 608 (4) (351 SE2d 448) (1987). Accordingly, her statement, even though hearsay, was admissible against her husband if, as the trial court concluded, it demonstrated sufficient trustworthiness.

The proponent of a hearsay statement must show " '*a circumstantial guarantee of the trustworthiness of the offered evidence . . . .*' [Cit.]" (Emphasis in original.) *Higgs v. State*, supra at 607 (3). This showing is based upon a consideration of the totality of the circumstances surrounding the making of an out-of-court statement. *Dix v. State*, 267 Ga. 429, 431 (2) (479 SE2d 739) (1997). On appeal, the appellate court must decide whether, considering all of the factors "taken as a whole[,] they were sufficient to support the trial court's decision . . . ." *Swain v. C&S Bank of Albany*, 258 Ga. 547, 550 (2) (372 SE2d 423) (1988). Thus, the trial court did not err in allowing this evidence if the circumstances surrounding Ms. Quijano's statement were sufficient to support the trial court's finding of a guaran-

tee of the reliability of that statement.

Ms. Quijano made the statement to police officers. She was not, however, in custody and was not being interrogated as a suspect in the murder. Therefore, the issue of the voluntariness of her statement or any hope of benefit which might have prompted her to make it are irrelevant considerations. The sole issue is whether her statement was sufficiently trustworthy, and the fact that it was given to officers who were investigating the crime, and not an off-the-cuff remark made to an otherwise disinterested individual, strongly indicated that it was reliable. *Drane v. State*, supra at 664 (1). Any duress and fear experienced by Ms. Quijano were not instilled by the officers themselves, but by forces over which they had no control. Being the spouse of a possible murderer is a daunting experience, but it is undisputed that the officers assured Ms. Quijano that she was not under arrest and would not be jailed. While she did indicate that she and her daughter were prepared to tell the officers "what they wanted to hear," there is certainly nothing which demands or even supports a finding that the officers wanted to hear anything but the truth. Surely, a witness who makes a statement to an officer in the course of an official investigation is not deemed inherently untrustworthy simply because she fears the consequences of failing to tell the officer the truth. Such a fear actually supports a finding of the underlying reliability of statements made in the course of an official investigation. The possible consequence of lying under such circumstances is a strong incentive for telling the truth. Thus, so long as the officers themselves expected to hear the truth from Ms. Quijano, her desire to tell them what they wanted to hear demonstrates her credibility rather than the lack thereof.

The only duress and fear expressed by Ms. Quijano which could have a negative bearing on her credibility was her concern for reprisal against her and her daughter by her husband's family. Again, however, this duress and fear is a compelling indication that she was speaking the truth when she made her statement. Despite having a reason to withhold evidence from the officers, she elected to make a statement which could jeopardize the safety of her daughter and herself. See *Chapel v. State*, 270 Ga. 151, 155 (4) (510 SE2d 802) (1998) (no motive to fabricate). Moreover, she never subsequently disavowed the inculpatory aspects of her statement, but elected to give no testimony either for or against her husband. *Drane v. State*, supra at 664 (1); *Higgs v. State*, supra at 608 (5) (c, d, e). Thus, Ms. Quijano's statement is not deemed trustworthy, as a matter of law, simply because she made it to police officers. However, the trial court was authorized to find that, despite Ms. Quijano's understandable distress, she spoke the truth because she gave her statement in the course of an official investigation of the murder, and because she had

no motive to lie, and because she never retracted the inculpatory aspects of her story.

Acceptance of Quijano's contention would mean that no statement made by a spouse in the context of an official criminal investigation could ever be admitted under the necessity hearsay exception, because of the emotional strain of being questioned under those circumstances. However, a criminal investigation is a search for the truth and, in the absence of any evidence which demands a finding to the contrary, a trial court properly determines that a jury would be authorized to conclude that a wife who had no motive to lie and who never recanted her story spoke truthfully when questioned by officers about her inculpatory knowledge of her husband's criminal conduct. *Chapel v. State,* supra; *Luallen v. State,* 266 Ga. 174, 179 (5) (465 SE2d 672) (1996); *Drane v. State,* supra; *Higgs v. State,* supra. Accordingly, the trial court in this case properly held that Ms. Quijano's statement was admissible pursuant to the necessity hearsay exception.

*Judgment affirmed. All the Justices concur, except Benham, C. J., Fletcher, P. J., and Sears, J., who concur specially.*

SEARS, Justice, concurring specially.

I believe that the majority's analysis in Division 4 concerning the admission of Mrs. Quijano's hearsay statements to police officers is based upon an incomplete reading of the relevant case law. Once that case law is fully considered, it becomes apparent that Mrs. Quijano's statements lacked sufficient indicia of reliability to warrant their admission. Therefore, unlike the majority, I believe that the trial court erred by admitting the statements into evidence. However, due to the overwhelming admissible evidence of appellant's guilt, I believe that the trial court's error was harmless. Therefore, I concur specially.

The officer who questioned Mrs. Quijano testified that during the interview, she was very frightened, and asked several times if she and her daughter (who was being questioned at the same time) were under arrest and would be taken to jail. Despite being told that she was not under arrest and would not be jailed, Mrs. Quijano remained upset and frightened, and expressed her distrust of the interviewing officer. She also said she feared reprisal from her husband's family. Later in the interview, Mrs. Quijano asked to speak with her daughter, who was being questioned in a separate room, and she told her daughter that if she did not tell police "what they wanted to hear," then Mrs. Quijano feared they both would be arrested and jailed. There is no evidence that any of the officers who were present when this statement was made attempted to refute Mrs. Quijano's assertion.

It is sometimes permissible to admit hearsay statements in limited situations of necessity where the declarant is unavailable for trial, and the statements sought to be admitted possess a guarantee of trustworthiness that is the substantive equivalent of the circumstances under which the declarant would have testified if available for trial.[2] We have previously held that a spouse who asserts the marital privilege in lieu of testifying is considered "unavailable" for purposes of the necessity exception.[3] However, as stated repeatedly by this Court, before hearsay statements can be admitted under the necessity exception, there must be a definite showing that the statements possess " 'a circumstantial guaranty of the trustworthiness . . . *that is, there must be something present [in the making of the statements] which the law considers a substitute for the oath of the declarant and his [or her] cross examination by the party against whom the hearsay is offered.*' "[4] In other words, there must be some particular facts relative to the declarant's making of the hearsay statement that is the equivalent of the circumstances under which a witness testifies at a criminal trial. Without a definite showing of such particular facts, the statement sought to be admitted remains pure hearsay, and is void of any evidentiary value whatsoever.[5]

Mrs. Quijano's hearsay statements made to police officers during her questioning lacked the indicia of trustworthiness required to warrant their admission under the necessity exception, and the trial court erred in admitting the statements. The evidence before the trial court showed beyond question that Mrs. Quijano made her statements under extreme duress and while in fear for her own safety, as well as that of her daughter. In fact, there is direct evidence that Mrs. Quijano honestly believed that unless she made statements incriminating her husband, she and her daughter would be arrested and jailed. These circumstances cannot be legitimately construed as the substantial equivalent of a witness's oath and cross-examination by opposing counsel. Accordingly, I believe the trial court erred in admitting Mrs. Quijano's hearsay statements under the necessity exception, just as the majority errs in sanctioning that admission.

The majority, however, concludes that a circumstantial guaran-

---

[2] See OCGA § 24-3-1 (b); *Drane v. State,* 265 Ga. 663, 664 (461 SE2d 224) (1995); *Higgs v. State,* 256 Ga. 606, 607 (351 SE2d 448) (1987).

[3] *Drane,* supra; *Higgs,* supra.

[4] *Higgs,* 256 Ga. at 607, quoting *Chrysler Motors Corp. v. Davis,* 226 Ga. 221, 224 (173 SE2d 691) (1970) (emphasis in original).

[5] In addition, we have recently emphasized that before hearsay evidence will be admitted under the necessity exception, it must be determined by the trial court that the evidence will be more probative than other admissible evidence. *Chapel v. State,* 270 Ga. 151, 155 (510 SE2d 802) (1998).

tee of trustworthiness existed because Mrs. Quijano made her statements to "officers who were investigating the crime."[6] However, as made clear by the precedent quoted above, a determination of trustworthiness, or the lack thereof, must be made upon the specific facts of the case under inquiry. If, in making this determination, the majority wishes to take into account the fact that Mrs. Quijano's hearsay statements were made to police officers, then it also must take into account the fact that she was fearful of being arrested by those same officers unless she gave them incriminating evidence. In this case, the factual determination of trustworthiness must necessarily take into account the declarant's subjective viewpoint concerning the circumstances in which she made her hearsay statements. I concede that there might be circumstances in which the fact that a witness spoke to police officers could be an indicia of reliability, such as where the declarant has previously demonstrated a high regard for, or willingness to cooperate with, law enforcement officers for altruistic reasons. However, those facts did not exist here. Here, the declarant was under extreme duress, stated that she *did not* trust the officers who were interrogating her, and said repeatedly that she was frightened she would be incarcerated by those same officers unless she implicated her husband in the crime. Under the precedent discussed above, these circumstances do not indicate that Mrs. Quijano's ultimate implication of her husband was trustworthy.

Nonetheless, the majority dismisses the facts attending Mrs. Quijano's hearsay statements by reasoning that simply because the statements were made to police officers, they were inherently trustworthy. Nothing in the case law, however, indicates that the trustworthiness of a hearsay statement turns on the profession of the individual to whom the statement was made. In this regard, I am concerned that in future cases, the majority's ruling could be misconstrued to actually make the inquiry regarding the trustworthiness of hearsay statements *less* fact-specific, and sanction the perfunctory admission of hearsay statements simply because they were made to law enforcement officers. Such a construction of the majority's ruling would be contradictory to this Court's carefully crafted precedent regarding the necessity exception, and would threaten the sanctity of the rule prohibiting the admission of hearsay testimony.

Despite my misgivings about the majority's analysis, however, I must agree with its ultimate conclusion. After reviewing the evidence in this case very closely, I conclude that the trial court's error in admitting the hearsay statements was harmless due to the other overwhelming evidence of appellant's guilt. Four eyewitnesses to the

---

[6] Op. at 185.

crime identified appellant as the perpetrator. One of those witnesses actually saw appellant dragging the victim's body across the floor. Appellant's hand prints were recovered at the crime scene from glass cases that had been cleaned only hours earlier. Appellant owned and drove the same model and color of car with the same specialized license tag as that used by the assailant, and he owned the same type of gun used in the murder. After the murder, appellant's car was returned to the lienholder, and his gun was destroyed and disposed of by family members. In light of this compelling and overwhelming evidence of appellant's guilt, I believe that in all likelihood, the improper admission of Mrs. Quijano's hearsay statements to police officers had no impact on the jury's verdict, and that the attending error therefore was harmless.[7]

I am authorized to state that Chief Justice Benham and Presiding Justice Fletcher join in this special concurrence.

DECIDED MAY 17, 1999 —
RECONSIDERATION DENIED JUNE 4, 1999.

*David S. West, Bruce S. Harvey,* for appellant.
*Patrick H. Head, Jr., District Attorney, Debra H. Bernes, Russell J. Parker, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Jeanne K. Strickland, Assistant Attorney General,* for appellee.

