S01A1799. WILSON v. THE STATE.
(562 SE2d 164)

HUNSTEIN, Justice.

Paul William Wilson appeals his convictions for malice murder, false imprisonment, theft by taking an automobile, and concealing

the death of another, in connection with the death of Carol Sue Gibbs. For the reasons that follow, we affirm.[1]

Construed to support the verdicts, the evidence showed that Gibbs, while married to Scott Gibbs, began dating Wilson. Gibbs was divorced on December 8, 1995. However, Gibbs expressed to friends a desire to reconcile with her ex-husband and break off her relationship with Wilson. She asked a friend to go to Wilson's house to get her possessions and Christmas gifts, but despite the friend arranging with Wilson to do so, and telling Wilson that Gibbs wanted nothing more to do with him and that he should leave her alone, the friend did not retrieve Gibbs's possessions. On December 29, 1995, Gibbs told another friend that she wanted to break up with Wilson. The previous day, Gibbs had told yet another friend that she would go to Wilson's home the next night to break up with him; the friend, who feared for Gibbs's safety, asked Gibbs to telephone before doing so in order for the friend to accompany Gibbs, but Gibbs did not do this. Gibbs's car was seen at 10:00 p.m. December 29, 1995, at Wilson's house. Gibbs was not seen alive again.

On January 1, 1996, her ex-husband, who had two of the couple's children for the holiday, had not heard from Gibbs about exchanging the children, and in fact had not heard from her since the afternoon of December 29. This was unusual as she frequently telephoned the children when they were with him. The family began searching for Gibbs and her brother visited Wilson, who stated that he had last seen Gibbs at about 7:00 p.m. on December 29, but that she had left and not returned to watch videos as they had planned. The family later found Gibbs's car at a Ramada Inn. Luminol tests were done on the car to determine if blood residue was present, and there was a small reaction in the passenger seat and a large reaction in the backseat.

---

[1] Carol Sue Gibbs was killed the night of December 29-30, 1995. On September 3, 1996, a Brooks County grand jury indicted Wilson on charges of malice murder, false imprisonment, theft by taking a motor vehicle, and concealing the death of another. On January 12, 2000, venue was changed to the Superior Court of Bibb County. Wilson was tried before a jury in that court from February 28, 2000 through March 11, 2000, and found guilty on all charges. The question of sentence was presented to the jury on March 12 and 13, 2000, and the jury found that aggravating factors were present and recommended a sentence of life in prison without the possibility of parole. See OCGA § 17-10-31.1. On March 13, 2000, the court sentenced Wilson to life in prison without the possibility of parole for malice murder, ten years for false imprisonment, to be served consecutively to the life term, ten years for theft by taking a motor vehicle, to be served consecutively to the sentence for false imprisonment, and twelve months for concealing the death of another, to be served consecutively to the sentence for taking a motor vehicle. On April 11, 2000, Wilson filed a notice of appeal in the Superior Court of Brooks County; on April 13, 2000, he filed a notice of appeal in the Superior Court of Bibb County. He amended his notice of appeal on May 5, 2000, and again on September 26, 2000. The case was docketed in this Court on August 28, 2001, and argued on January 15, 2002.

Bennett, the driver of a taxicab, accompanied by her boyfriend Ganzer, picked Wilson up at a Quality Inn on December 30, at 5:49 a.m. and took him to a church near his house. The Quality Inn is next to the Ramada Inn where Gibbs's car was found. A security videotape from a gas station next to the motels showed Wilson several times, from 4:53 to 5:46 a.m. on December 30, 1995, and the gas station clerk testified that Wilson spent approximately two hours there.

Wilson was interviewed on January 2, 1996; he was not in custody at that time. There were scratch marks on his arms. He said that Gibbs had brought rental movies to his house on December 29, they went out for some fried chicken, returned and watched movies, Gibbs left at 12:30 a.m. on December 30, and she was to call him when she got home, but did not. However, the receipt from the fried chicken restaurant found in Gibbs's car, and the surveillance videotape from the videotape rental store did not confirm Wilson's version of events. On January 3, the police attempted to speak with Wilson again. Wilson told one officer on the telephone that he would speak with them, but when another officer, who was half-a-mile away during the telephone call, arrived, Wilson was absent. On January 5, Wilson was placed in custody for violating his probation on prior unrelated charges. He was interviewed again, and confronted with the contradictions to his story. Wilson admitted that he had lied earlier and stated that a sleeping bag was missing from his house because a cousin had borrowed it. When asked what he thought had happened to Gibbs, he said that after she left, she may have encountered someone she knew, and that he "felt" that she had been tied up against her will. On January 6, Wilson said that it was possible that "the bad Paul" may have killed Gibbs, but he did not remember. Wilson's January 7 statement to police was suppressed by the trial court. In his January 8 statement, Wilson told police in pertinent part that his family told him he had a bad temper but that he had never hurt anyone; Wilson had removed Gibbs's bra while she sat on the sofa but did not know where it was; if Gibbs had accused him of doing something he did not do, he could have become agitated about it, but he did not remember that happening; that he recalled an incident in a shed behind his house in which Gibbs had blood on her, which he wiped off with an old white rag; and that in response to a question about why towels were in the sleeping bag in which Gibbs was found, he responded that he used them to try and stop the bleeding from her head.

Gibbs's body was found on January 7, in a green sleeping bag. The body was at a church cemetery near Wilson's home and in which his parents were buried. An extension cord was tied around Gibbs's wrists, there were bruises on her face, and she had a fractured skull; she had been hit in the head at least four times and blunt force

trauma to the head was the cause of death. She was alive when she was bound. A search warrant for Wilson's home was executed on January 4, and a Luminol test revealed blood splatters, some with a wiping motion to them, on the floor, doors and walls. DNA from bloodstains inside Wilson's home, including on a flier for a pizza restaurant, matched that of Gibbs. Blood splatters inside the house, together with autopsy evidence, indicated that Gibbs was seated on the floor, hands bound, when she was struck on the side of the head.

1. Wilson contends that the evidence was insufficient to support the verdicts, contending that the evidence against him was completely circumstantial and did not exclude every reasonable hypothesis save that of his guilt. See OCGA § 24-4-6. Specifically, Wilson contends that the State's evidence did not exclude the possibility that Gibbs was killed by her former husband, Scott Gibbs.

Pretermitting whether the evidence against Wilson was solely circumstantial, evidence showed that Scott Gibbs would have gained financially by the death of his ex-wife. It was also shown that he was in possession of her wedding ring when first interviewed by police, that he had removed money from Gibbs's dresser when looking for information about her whereabouts, and that when first interviewed by police, he gave an incorrect account of his actions and whereabouts on the night of December 29, 1995. However, Gibbs testified how he found the wedding ring, that he removed the money for safekeeping, and that in his initial recounting to the police of his whereabouts for a period of several days, he had mistaken what nights he had been helping his brother in working on his kitchen. Further, evidence showed that Scott Gibbs was approximately the same size as the victim and had had two back surgeries that limited the weight he could lift to fifty pounds, and it was clear that the victim's body had been moved.

> [Q]uestions as to the reasonableness of hypotheses are generally to be decided by the jury which heard the evidence and where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of guilt, that finding will not be disturbed unless the verdict of guilty is insupportable as a matter of law. [Cit.]

*Robbins v. State*, 269 Ga. 500, 501 (1) (499 SE2d 323) (1998). The jury was properly charged on the use of circumstantial evidence under OCGA § 24-4-6. The evidence authorized the jury to exclude all reasonable hypotheses other than Wilson's guilt and to find Wilson guilty beyond a reasonable doubt of the crimes of which he was con-

victed. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Wilson contends that the statement he made to police while in custody on January 8, 1996 should have been suppressed. Wilson argues that the trial court erred by admitting the January 8 statement despite the fact that the court suppressed Wilson's statement made to police on January 7, 1996 because the police failed to cease interrogating Wilson after he told them he was "through talking" to them. The trial court determined that Wilson's "right to cut off questioning" had not been "scrupulously honored" by police as required by *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966) and *Michigan v. Mosley*, 423 U. S. 96 (96 SC 321, 46 LE2d 313) (1975). The trial court, however, determined that Wilson's January 8 statement was admissible because a "significant period of time" had passed between his invocation of his right to silence on January 7 and the interview conducted sixteen to seventeen hours later on January 8. Although we disagree with the trial court's reasoning, we find that Wilson's January 8 statement was admissible on different grounds and find no error in the trial court's ruling.

In *Michigan v. Mosley*, supra, the United States Supreme Court considered under what circumstances custodial interrogation may be resumed after a person in custody has indicated a desire to remain silent. The *Mosley* Court found that the defendant's "right to cut off questioning" was "scrupulously honored" where the police

> immediately ceased the interrogation [after the defendant indicated he no longer wanted to talk], resumed questioning only after the passage of a significant period of time and the provision of a fresh set of [*Miranda*] warnings, *and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.*

(Emphasis supplied.) Id., 423 U. S. at 106.

We disagree with the trial court that Wilson's invocation of his right to remain silent was no longer effective simply because seventeen hours had elapsed between the conclusion of the interrogation in which he invoked that right and the start of the subsequent interrogation. While this Court has recognized that a subsequent interrogation on a *different* crime, albeit arising out of the same events, does not violate *Mosley*'s mandate, *Bright v. State*, 251 Ga. 440 (306 SE2d 293) (1983), we have heretofore sanctioned reinterrogation of a suspect regarding the *same* crime that was the subject of the early interrogation only in *Fields v. State*, 266 Ga. 241 (1) (466 SE2d 202) (1996), in which we determined the evidence established that the officers had complied with *Mosley* based on the fact that ten *months*

had elapsed between the two interrogations.

The State asserts that *Hatcher v. State*, 259 Ga. 274 (379 SE2d 775) (1989) serves as authority for the trial court's holding, claiming that the *Hatcher* Court approved a mere "five hours" as a sufficient period of time before police reinterrogation. The facts in *Hatcher*, however, clearly reveal that while Hatcher stated early in the first interrogation that he did not want to talk to police, he then reconsidered and allowed the interrogation to proceed. The "five hour break" discussed in *Hatcher* occurred while Hatcher was still willing to talk to police. Thus, *Hatcher* in no manner supports the trial court's ruling that the passage of seventeen hours between interrogations constituted such a "significant period of time" that Wilson's previous invocation of his right to cut off questioning had lost its effectiveness.

We recognize that a person's right to silence is not protected by any per se rule of "permanent immunity" against further police-initiated interrogation. *Mosley*, supra, 423 U. S. at 102. However, under the facts in this case, we conclude that the sixteen to seventeen hour break between the conclusion of the January 7 interrogation and the start of the January 8 interrogation fails to reflect the "significant period of time" required by *Mosley* to warrant reinterrogation by police on the *same* crime that was the subject of the January 7 interrogation.

Although the trial court erred by ruling that the January 8 statement was admissible because the passage of seventeen hours between interrogations qualified as a significant period of time under *Mosley*, supra, Wilson's January 8 statement to the police was admissible for a separate reason. Testimony was adduced at trial that when the police approached Wilson on January 8, they did so because Wilson had previously indicated to the police that he wanted to see the autopsy photographs. At the January 8 interrogation, the officers first read Wilson his *Miranda* rights again and obtained his waiver of those rights. An officer then explained to Wilson that he had returned because of Wilson's request to see the photos, asked Wilson whether he still wanted to see them, and in response to Wilson's affirmative reply showed him the pictures. The officer asked no questions of Wilson as he viewed the gruesome photos. It was only after Wilson turned to the officer and said he "wanted to know what had happened to [the victim's] head," that the officer "reversed the question" by replying "I would like for you to tell me that." The interrogation continued from that point.

We have recognized that it is not error to admit a statement when the defendant chooses to continue the interrogation by initiating conversation with police, thereby evincing his intent not to remain silent. See *Larry v. State*, 266 Ga. 284, 286 (466 SE2d 850) (1996); *Hatcher*, supra. From the uncontroverted testimony adduced

at trial, we find that the evidence established that Wilson indicated his willingness to talk with police on January 8 when he initiated further dialogue with them over the autopsy photographs. For this reason we find no error in the trial court's admission of Wilson's January 8 statement.

3. State's witnesses Bennett and Ganzer identified Wilson as having taken a taxicab driven by Bennett from a Quality Inn motel to a driveway next door to the church where Gibbs's body was found. Wilson challenges these in-court identifications as tainted by improper pre-trial procedures. During Bennett's testimony, she stated that when the police first interviewed her, she was shown a photograph of the victim, and a photograph of Wilson, and asked if she had ever seen them. She was later shown a photograph array, from which she picked out Wilson. Wilson moved for a mistrial on the ground that Bennett's identification was tainted. The court denied the motion, but ruled that evidence of the photo array, and the single photograph of Wilson, was inadmissible. The jury returned, and the court instructed it to disregard any identification evidence of the photographs.

When Bennett picked up Wilson on December 30, 1995, Ganzer, her boyfriend, was in the taxicab. He also identified Wilson from a photographic array, but had not been shown any photographs earlier. The State showed Ganzer a single photograph of Wilson the night before his testimony. Wilson moved for a mistrial as to Ganzer's identification as well.

> "Convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. [Cits.] . . ." [Cit.] "Moreover, 'even if a pretrial identification is tainted, an in-court identification is not constitutionally inadmissible if it does not depend upon the prior identification but has an independent origin. (Cit.)' [Cit.] . . ." [Cit.]

*Quijano v. State*, 271 Ga. 181, 184 (3) (516 SE2d 81) (1999). Both witnesses testified that their identification of Wilson was based on their observations on the night in question, and they were certain in their identifications. Thus, even assuming that the procedures of which Wilson complains were improperly suggestive, the witnesses' identifications of Wilson were admissible. Id.

4. Finally, Wilson contends that the court should have given his requested charge that read: "A statement which does not confess guilt, though incriminating in nature, is an admission only. As such,

it is not direct evidence of guilt, but only circumstantial evidence intended to prove the offense when considered with other evidence and may be used to justify a conviction." The language of this request is adapted from *Thompson v. State*, 151 Ga. App. 128 (258 SE2d 776) (1979). However, " '(e)ven though language used by the appellate courts in a decision may embody sound law, it is not always appropriate to employ such language in instructing the jury.' [Cit.]" *Pecina v. State*, 274 Ga. 416, 421 (5) (554 SE2d 167) (2001). The statement in *Thompson*, supra, related to the issue before that court; whether the statement at issue in that case was a confession, requiring corroboration to authorize a conviction, see OCGA § 24-3-53, or an admission that did not include a confession of guilt. Thus, the language in *Thompson* dealt with an issue not present in this case, and the trial court was correct in determining that the requested language was not appropriate for a jury charge.

Here the court correctly instructed the jury on direct and circumstantial evidence, and specifically charged that to warrant a conviction on circumstantial evidence alone, that evidence must be consistent with the theory of Wilson's guilt and exclude all other reasonable hypotheses except his guilt. "It is a fundamental rule in Georgia that jury instructions must be read and considered as a whole in determining whether the charge contained error." (Citation and punctuation omitted.) *Hambrick v. State*, 256 Ga. 688, 690 (3) (353 SE2d 177) (1987). Viewing the charge as a whole, there was no error in the court's instructions on direct and circumstantial evidence. There was no need for the court to label any specific evidence as either circumstantial or direct, and it properly declined to do so.

*Judgment affirmed. All the Justices concur, except Benham, Carley and Hines, JJ., who concur specially.*

HINES, Justice, concurring specially.

I join the majority opinion in Divisions 1, 3, and 4, and in the judgment, but I do not agree with the majority's reasoning in Division 2.

The circumstances of Wilson's interrogation on January 8 cannot credibly be described as Wilson having initiated conversation with police. In an interview on January 7, Wilson invoked his right to remain silent; it went unheeded. It was *after* that violation that police asked if Wilson wanted them to return and tell him what the autopsy showed and he answered: "You can." The next day, he was brought into the interrogation room, read his *Miranda*[2] rights, and signed a waiver of those rights. The police then "advised [Wilson] as

---

[2] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

to the information gained during the autopsy" and asked Wilson if he wanted to see the color photographs of the autopsy; he said he did. It was only then that Wilson asked police what had happened to Gibbs's head. But contrary to the majority's holding, it was the police who "first displayed a willingness and desire to talk about the investigation by inquiring whether appellant" wished to see the autopsy photographs. *Walton v. State*, 267 Ga. 713, 717 (3) (482 SE2d 330) (1997). Thus, the violation of Wilson's right to cut off questioning on January 7 is not "cured" in the manner the majority finds. Nor does the fact that Wilson executed a waiver of his *Miranda* rights on January 8 after his invocation of those rights was ignored on January 7 "cure" the police violation; if renewed *Miranda* warnings and a consequent waiver, in and of itself, could repair the police's failure to honor the invocation of the right to silence, it would not matter whether the elapsed time since the violation was seventeen hours, seventeen months, or seventeen seconds. Rather, the proper analysis is not so simple; the fundamental question is what effect Wilson's unheeded invocation of the right to silence on January 7 has on the statement of January 8. This requires not only an examination of *Miranda* and its progeny, but whether the statement of January 8 is itself involuntary under the Fifth Amendment, and whether the earlier statement on which the statement of January 8 was based violated the Fifth Amendment.

On January 7, Wilson signed a form waiving his rights under *Miranda*. Before signing the form, Wilson read aloud each of his rights and explained each to the officers. During the course of the interview, Wilson asked: "Oh well, what are you going to do with me?" An officer responded: "Are you anxious to get back in a cell?" Wilson then said: "No, but I am through talking, I mean right now." A different officer asked: "You think you can live with it there?", and the interview continued. Later in the interview, Wilson told the officers that Gibbs had strangled during "sexual play." This version of events was later contradicted by the results of the autopsy.

In excluding Wilson's statement of January 7, the trial court relied on *Miranda*, supra, and *Michigan v. Mosley*, 423 U. S. 96 (96 SC 321, 46 LE2d 313) (1975), as well as certain Georgia cases, for the propositions that when a suspect during an interrogation indicates in any manner that he has decided to remain silent, the interrogation must cease, this right must be "scrupulously honored," and the invocation of the right, while not a permanent bar to police questioning, does bar questioning for a "significant period of time" after the request. See also *Hatcher v. State*, 259 Ga. 274, 277 (2) (379 SE2d 775) (1989). The trial court correctly concluded that Wilson's right to end the interview of January 7 was not "scrupulously honored," and therefore was to be suppressed. See *Hatcher*, supra.

However, it does not automatically follow that the interview of January 8 must also be excluded, even if it was based on the information learned in the interview of January 7. The court found that the January 7 interview violated *Miranda* and *Mosley,* but did not find that the statement of January 7 ran afoul of the Fifth Amendment. When a suspect has been advised of his rights, and the suspect invokes his right to counsel which is unheeded by the interrogating officers, the statement that follows is inadmissible as violating the prophylactic rules of *Miranda* and its progeny, but the statement is not necessarily involuntary under the Fifth Amendment; if the statement is voluntary under the Fifth Amendment, it will not invalidate any "fruit" of that interview. *Taylor v. State,* 274 Ga. 269, 271-277 (1)-(4) (553 SE2d 598) (2001). See also *Moore v. State,* 263 Ga. 11, 12 (1) (427 SE2d 766) (1993). The same analysis applies when an invocation of the right to remain silent goes unheeded. See *Martin v. Wainwright,* 770 F2d 918, 924 (11th Cir. 1985) (equating an equivocal request for counsel with an equivocal invocation of the right to silence). See also *Livingston v. State,* 264 Ga. 402, 408 (6) (444 SE2d 748) (1994) (determining that when one statement is made without benefit of *Miranda* warnings, it will not taint a subsequent statement unless the initial statement violated the Fifth Amendment). Wilson's statement of January 8 was based in part on what he told the police on January 7, after invoking his right to remain silent. Thus, the issue of whether Wilson's statement of January 8 is admissible depends in part on whether his statement of January 7 violated the Fifth Amendment.

In that context, "[i]f a suspect's statements [were] obtained by 'techniques and methods offensive to due process,' [cits.], or under circumstances in which the suspect clearly had no opportunity to exercise a 'free and unconstrained will,' [cit.], the statements would not be admitted." *Oregon v. Elstad,* 470 U. S. 298, 304 (105 SC 1285, 84 LE2d 222) (1985). Although the interview of January 7 was lengthy, there is no evidence that Wilson was fatigued and there is evidence that he had several breaks. The officers did not apply any force, made no threats, and did not offer any inducements or promises. Further, at no time did Wilson explicitly refuse to answer questions; while such a refusal was not necessary to invoke his *Miranda* rights, it is probative evidence that his statement of January 7 comported with the Fifth Amendment. *Martin,* supra at 927, n. 12. As the statement of January 7 was voluntary under the Fifth Amendment, the statement of January 8 is not inadmissible as the "fruit" of the earlier statement.

Although Wilson argues that the trial court failed to evaluate the statement of January 8 in light of the totality of the circumstances, considering only whether "a significant period of time" had

passed between Wilson's invocation of his right to remain silent on January 7 and the interview on January 8, see *Hatcher*, supra at 277 (2), the court order is not so limited. It is clear that the court considered more than merely the passage of time; the court noted that Wilson had been re-advised of his *Miranda* rights, that the police made no threats, coercions, acts of force, or promises of leniency, and extended no hope of reward or benefit. The court also found, correctly, that the sixteen or seventeen hours that had passed since the end of the prior interview was a "significant period of time" within the meaning of *Hatcher*, supra.

The court also considered a variety of factors regarding the statement of January 7, that to some extent remained on January 8, and it is clear that the court considered the totality of the circumstances surrounding the statement of January 8 and concluded that those circumstances did not show that Wilson's statement of January 8 was inadmissible. Wilson argues that several specific factors compel a finding that the statement of January 8 should have been suppressed, but they do not. He was 29 years of age. Although he stated he could read and write poorly, he had a tenth grade education, and demonstrated in the interview on January 7 that he could read, understand, and explain, his rights. During the execution of the waiver form on January 7, Wilson asked about telephone calls, and was told that the sheriff's office was having telephone trouble, but that he should "keep on track" while the form was completed. After the form was completed, Wilson specifically asked whether he could refuse to answer further questions at any time, and was twice assured that he could. Although he was being held for probation violations, Wilson knew that the officers were investigating first the disappearance of Gibbs, then her murder.

Inasmuch as the January 7 statement, though violative of *Miranda* and *Mosley*, was not involuntary under the Fifth Amendment, a significant period of time passed between the invocation of the right to remain silent and the statement of January 8, and the statement of January 8 was shown to be voluntary, the trial court properly admitted evidence of Wilson's statement on January 8.

I am authorized to state that Justice Benham and Justice Carley join in this special concurrence.

DECIDED MARCH 29, 2002.

*Jon W. McClure, J. Michael Bass*, for appellant.
*J. David Miller, District Attorney, Thurbert E. Baker, Attorney*

*General, Madonna M. Heinemeyer, Assistant Attorney General,* for appellee.