## A10A0337. HART v. THE STATE.
(699 SE2d 445)

PHIPPS, Presiding Judge.

In connection with a shooting and armed robbery incident at a store, Andrew Hart was tried before a jury, then convicted for: aggravated assault, by shooting a customer; armed robbery of the store clerk, by taking the store's cash, checks, and credit card receipts from her by use of a handgun; aggravated assault, by pointing the handgun at the store clerk and shooting in her direction; possession of a firearm during the commission of a felony; and possession of a firearm by a convicted felon. Hart appeals his convictions, asserting various evidentiary challenges and contesting the trial court's rejection of his claim that his trial counsel was ineffective. We find merit in Hart's challenge to the admission of certain hearsay testimony and accordingly reverse. Because the evidence was sufficient as to each offense of which Hart was found guilty, he may be retried.[1]

1. Hart challenges the sufficiency of the evidence. When an appellant challenges the sufficiency of the evidence to support his conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[2]

At about 8:50 p.m. on December 6, 2004, a man wearing green, jumpsuit-style coveralls and a greenish-gray hood with eyeholes (such that almost all of his body was covered) rushed into the Bay Station store in Millen, shot a customer in the leg, pointed the gun at the store clerk, then threatened to shoot the customer again if she (the clerk) did not give him money and other valuables he indicated were stashed behind the counter. The clerk provided the gunman with the store's cash, checks, and credit card receipts. After exiting the store, the man turned around near the glass door, pointed the gun toward the clerk, fired another shot, then fled on foot. A surveillance camera in the store captured images of the robbery, which were shown to the jury.

Evidence that Hart was the masked perpetrator included the following. Earlier on the day of the incident, Hart had been working at his job "[i]n front of the Bay Station." He did not have an operable vehicle at the time and left his workplace at 5:00 p.m., riding with a co-worker. The co-worker testified that Hart soon spotted one of his

---

[1] See *Lively v. State*, 262 Ga. 510, 512 (3) (421 SE2d 528) (1992).

[2] *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979) (emphasis in original).

260

friends, and at Hart's request, they followed the friend into a nearby parking lot, where Hart got out of the vehicle and briefly talked to his friend before returning to the vehicle. Hart's friend revealed at trial that when Hart approached him in the parking lot, Hart asked to borrow his hood. The friend handed it to Hart, and Hart left with it. The hood, Hart's friend described, had "fatigue colors"; its front was primarily green and black, with cutouts for the wearer's eyes. Hart's friend testified that Hart never returned his hood; the friend was shown security camera images of the Bay Station incident and testified that his hood was "kind of like that" one covering the robber's head.

Within about thirty minutes of the robbery, Hart showed up at a trailer where two of his acquaintances lived. The residents were not at home, but there were several visitors at the trailer. One visitor soon acted as a confidential informant (CI) and contacted a deputy sheriff at about 9:15 p.m. Based on information the CI reported, the deputy sheriff and other law enforcement officers went to the trailer that same night. By this time, Hart was no longer at the trailer. The officers obtained permission to enter the residence and found in a trash bag located just inside the front door torn checks and credit card receipts. With gloved hands, the deputy sheriff seized these items. It was determined that the checks had been stolen during the Bay Station robbery.

An investigator, who had examined impressions left on the pieces of paper and compared the impressions with Hart's finger and palm prints, was qualified without objection at trial as an expert in the area of fingerprint analysis. The investigator opined that a palm print detected on a piece of seized paper was identical to Hart's palm print. Moreover, the investigator testified that in his years of experience, he had never known of two individuals with the same finger or palm print. Then, while demonstrating for the jury, the expert testified, "It appears [as] if somebody held a receipt with their hand like this and tore it, thus leaving the impression on the receipt as it's found there. . . . So somebody would have had to hold the paper like I showed and tear it."

Hart conceded at trial that he arrived at the trailer that night on foot, and the state presented evidence that across the street from the store began a foot path, which led to the trailer park community. The distance between the store and the trailer Hart visited that night equated to about a seven-minute walk.

Law enforcement officers went to Hart's residence looking for Hart on the night in question, but he was not at home. Hart was then living with his grandmother and his uncle. His uncle testified that when he (the uncle) arrived home at about 8:30 p.m., Hart was not there. Hart's uncle told the officers that, a few days before, he saw

Hart wearing coveralls that were "sort of lime green" in color and made "sort of like a jumper." The officers asked Hart's uncle to show them where Hart kept the coveralls, but when the uncle led the officers to the location, the coveralls were not there. The officers were given permission to look in that area for coveralls, but did not find any. During a subsequent visit to the residence at about 2:00 a.m., Hart was at home, and the officers took him into custody.

Still in jail several days later, Hart signed an acknowledgment and waiver of his *Miranda* rights, then gave an oral statement to a Georgia Bureau of Investigation (GBI) agent. The agent testified that Hart told him that, on the day of the incident, he left work shortly after 5:00 p.m. and was taken by his co-worker home to his grandmother's house, where he remained. In response to specific questions, Hart denied that he had met with a friend before going home, denied going to the trailer that evening, denied owning a pair of green coveralls, stated that he had no explanation for how his print could be detected on any piece of paper taken during the Bay Station incident, and asserted that his uncle had been mistaken when he told officers that he (Hart) was not home that evening. Hart claimed that during the time he was at home, no one else was there.

At trial, however, Hart denied giving a police statement that he went straight home after work that day. He testified that, instead, he told the agent that he first met a friend, who agreed to let him borrow his mask, but that he never borrowed it. At trial, Hart also denied giving a police statement that he had not been at the trailer on the night in question and that he had no explanation for his print being found on seized evidence. Hart testified that, instead, he told the agent that he did go to the trailer; that while there, he was handed some checks by the individual who had later acted as a CI; that the individual wanted to know whether the checks were worth anything; and that after determining that the checks were "already cashed," he told that individual that the checks were worthless and handed them back. After he left the trailer, Hart testified, he went to his grandmother's house, where he remained until he was taken into custody.

Finally, the state showed that, when the Bay Station crimes were committed, Hart was a convicted felon.

(a) Citing what he claims were weaknesses in the state's case, Hart contends that the circumstantial evidence concerning identity was insufficient to establish that he was the masked perpetrator of the crimes. Hart asserts that the crimes could have been committed, for example, by anyone who was at the trailer where the torn checks and receipts were discovered.

Where evidence regarding identity is entirely circumstantial,

> such evidence must be so strong as to exclude every other reasonable hypothesis save that of the guilt of the accused. But it need not exclude every *conceivable* inference or hypothesis — only those that are reasonable. Whether every reasonable hypothesis except that of the guilt of the defendant has been excluded is a question for the jury. Where the jury determines the evidence excluded every reasonable hypothesis save that of guilt, such a finding will be not be disturbed unless the verdict of guilty is insupportable as a matter of law.[3]

We conclude that the evidence, viewed in favor of the prosecution, authorized the jury to exclude all reasonable hypotheses other than Hart's guilt and to find beyond a reasonable doubt that he was the perpetrator of the crimes.[4]

(b) Hart contends that, even if his identity was proved, the evidence failed to establish other elements of the charge of aggravated assault upon the store clerk. As to that count, the indictment alleged that Hart made "an assault upon the person of [the store clerk], with a deadly weapon to wit: a certain handgun by pointing said handgun at [her] and by shooting in the direction of [her] as he exited the Bay Station." Hart acknowledges that "[i]ntentionally firing a gun at another, absent justification, is sufficient in and of itself to support a conviction of aggravated assault."[5] However, he asserts that "the jury was not charged on this method of proving aggravated assault, and therefore the jury would not have been authorized to convict on this basis."

Contrary to Hart's assertion, the trial transcript shows that in charging the elements of aggravated assault, the court informed the jury that

> a person commits the offense of Aggravated Assault when that person assaults another person with a deadly weapon. To constitute such an assault actual injury to the alleged victim need not be shown. It is only necessary that the evidence show beyond a reasonable doubt that the defen-

---

[3] *Merritt v. State*, 285 Ga. 778, 779 (1) (683 SE2d 855) (2009) (citations omitted; emphasis in original).

[4] See *Jackson*, supra; *Merritt*, supra at 779-780; *Wilson v. State*, 275 Ga. 53, 56 (1) (562 SE2d 164) (2002); *Williams v. State*, 164 Ga. App. 621, 622 (1) (298 SE2d 306) (1982) ("mere possibility that someone other than defendant committed the crime" need not be excluded for circumstantial evidence to authorize defendant's conviction).

[5] *Love v. State*, 268 Ga. 484, 485 (1) (490 SE2d 88) (1997).

dant attempted to cause a violent injury to the alleged victim or intentionally committed an act that placed the alleged victim in reasonable fear of immediately receiving a violent injury.[6]

Pretermitting whether Hart's contention is properly characterized as a challenge to the sufficiency of the evidence, we find no reversible error, given that Hart's underlying assertion is belied by the transcript.

2. Hart contends that the trial court erred by allowing the state to introduce evidence of the statement he gave to the GBI agent while in police custody. Hart complains that, while not directly inculpatory, the custodial statement was nevertheless damaging because the state used it to portray him as having lied about his activities on the night in question. Hart argues that the evidence was inadmissible because on the previous day, when being questioned by a different law enforcement officer, he invoked his *Miranda* right to remain silent.[7]

"[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was scrupulously honored."[8] Hart makes no claim that the procedures followed when he invoked his right to remain silent on December 9, standing alone, failed to comply with *Miranda* strictures.[9] He focuses instead on the GBI agent's interaction with him the following day.

The agent was the sole witness at the pre-trial hearing on whether evidence of Hart's custodial statement was admissible. He stated that he met with Hart shortly after noon on December 10 at the sheriff's office where the jail was located. The agent testified that Hart had been brought from the holding cell, and while the agent was "filling out the standard arrest record for the defendant," Hart said to him that he wanted to know "what's going on with all this." The agent testified that, at that time, he was aware that Hart had invoked his right to remain silent the day before. The agent described his response to Hart: "I told him that I could not speak to him until — I had to read him his rights." Accordingly, before any further conversation took place, the agent advised Hart of his

---

[6] See generally OCGA §§ 16-5-20 (a); 16-5-21 (a) (2).

[7] The record shows that on December 9, 2004, Hart signed a document that stated, "I do not wish to give a statement on any criminal activities."

[8] *Michigan v. Mosley*, 423 U. S. 96, 104 (96 SC 321, 46 LE2d 313) (1975) (punctuation omitted), citing *Miranda v. Arizona*, 384 U. S. 436, 474 (86 SC 1602, 16 LE2d 694) (1966); see *Griffin v. State*, 280 Ga. 683, 685 (2) (631 SE2d 671) (2006).

[9] In fact, Hart states in his brief that he invoked his "right to remain silent upon questioning by another officer . . . [and] that right was respected."

*Miranda* rights. Hart then signed a waiver of his *Miranda* rights, which was later introduced in evidence. After signing the waiver, Hart gave the police statement at issue here.

Hart's lawyer argued at the hearing that Hart's own question about the matter did not initiate any conversation about the criminal incident. The trial court ruled, however, that Hart's custodial statement was admissible, finding that "the defendant initiated the conversation with [the agent], that [the agent] re-[M]irandized him, and that the statements made were freely and voluntarily given." On appeal, Hart asserts that the agent tricked him into giving the custodial statement, citing the agent's testimony at the hearing: "I was present at the jail, obtaining records, things of that nature, and my premise was to go there and see if he did want to speak to me concerning the incident at the Millen Bay Station." A trial court's finding relating to the admissibility of an incriminating statement will be upheld on appeal unless clearly erroneous.[10]

> [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police *(other than those normally attendant to arrest and custody)* that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.[11]

Notwithstanding the testimony cited by Hart, the trial court was authorized to find that the agent nevertheless limited his interaction with Hart to obtaining information normally attendant to arrest and custody and that it was Hart who interjected a question that changed the course of their interaction.[12] The record authorized a finding that Hart's pivotal question was spontaneous and "not made in response to any form of custodial interrogation [and thus] not subject to the

---

[10] *Daniel v. State*, 268 Ga. 9, 10 (2) (485 SE2d 734) (1997).

[11] *Rhode Island v. Innis*, 446 U. S. 291, 300-301 (II) (A) (100 SC 1682, 64 LE2d 297) (1980) (footnotes omitted; emphasis supplied).

[12] See *Metts v. State*, 270 Ga. 481, 483-484 (3) (511 SE2d 508) (1999) (where appellant "began talking about the [criminal incident at issue] when the detective asked 'booking' questions related to appellant's identity," the inculpatory statement made to detective was not subject to suppression because it was not the product of an interrogation or its functional equivalent); *Franks v. State,* 268 Ga. 238, 239 (486 SE2d 594) (1997) (noting that "[a] well-established line of federal and state case law has created an exemption from the *Miranda* rule for questions attendant to arrest, because such questions are not related to the investigation of the case, and at the same time serve a legitimate administrative need").

strictures of *Miranda*";[13] that it was thus Hart who initiated the conversation about the criminal incident underlying this case, thereby evincing his intent not to remain silent;[14] that the agent read Hart his *Miranda* rights again before that conversation; and that Hart's subsequent police statement was freely and voluntarily given. Under this record, Hart has not shown that the trial court was mandated to find that his right to cut off questioning was not scrupulously honored.[15]

3. Hart contends that the trial court erred by allowing one of the two residents of the trailer to give what he maintains was hearsay testimony. The resident testified that, when he arrived home on the night in question, Latrell Gaines, a visitor who was already at his trailer, warned him to be careful because Hart and someone known as "Swick" had just robbed the Bay Station store. Hart maintains that the resident's testimony about Gaines's out-of-court statement was not only impermissible hearsay, but extremely prejudicial because it was the only direct "evidence" that he was the perpetrator of the underlying crimes. The state counters that the trial court properly admitted the trailer resident's testimony as a prior inconsistent statement by Gaines, because earlier during the trial, Gaines testified that he did not recall making such statement to the trailer resident.

The record shows that, before calling the resident as a witness, the state called Gaines to testify about what happened at the trailer that evening. In response to the prosecutor's questions, Gaines recounted that he had been at the trailer "mostly all day" and into the evening; that Hart stopped by the trailer that night and the two of them smoked a "blunt"; and that after Hart left, the two residents of the trailer returned home between 9:00 and 9:30 p.m. But when the prosecutor asked Gaines to tell the jury what he had told the residents upon their arrival, Gaines claimed he could not remember.

---

[13] *Phillips v. State*, 285 Ga. 213, 215 (2) (675 SE2d 1) (2009).

[14] See *Larry v. State*, 266 Ga. 284, 285-286 (2) (a) (466 SE2d 850) (1996) (where investigator read appellant the *Miranda* rights and appellant stated that he did not wish to talk to investigator, yet minutes later began to talk about the underlying criminal incident, appellant clearly evinced his intent not to remain silent; evidence thus supported trial court's finding that appellant's statement to investigator was admissible); see generally *Wilson*, supra, at 58-59 (2) (in homicide case, finding no error in admission of appellant's police statement, where uncontroverted testimony established that, although appellant initially invoked his right to remain silent, he subsequently indicated his willingness to talk with police by initiating dialogue with them about autopsy photographs).

[15] See *Mosley*, supra; *Phillips*, supra; *Wilson*, supra; *Metts*, supra; *Franks*, supra; *Larry*, supra.

The prosecutor pressed:

> Q: You don't remember making any statement to them about Andrew Hart?
> A: No, ma'am.
>
> . . .
>
> Q: So it's your testimony here today that you don't remember telling [the residents] anything about Andrew Hart?
> A: Yes, ma'am. I don't remember saying nothing about that.
>
> . . .
>
> Q: [Gaines], do you remember telling — I know you said you don't remember telling [the trailer residents] anything when they got home. But do you remember telling them to be careful because Andrew had just robbed the Bay Station?

After the ensuing objection and discussion between court and counsel, Gaines answered, "No."

The state claims that, because Gaines thus gave testimony it had not expected, it was entitled to impeach him pursuant to OCGA § 24-9-83. That Code section provides that "[a] witness may be impeached by contradictory statements previously made by him as to matters relevant to his testimony and to the case." Furthermore, the state points out that "a prior inconsistent statement of a witness who takes the stand and is subject to cross-examination is admissible as *substantive* evidence."[16]

Hart counters that OCGA § 24-9-83 was not properly invoked because the proponent of the evidence (the state) failed to show that the witness it sought to impeach (Gaines) had any personal knowledge of the truth of his alleged previous out-of-court statement (that Hart had committed the robbery at the Bay Station store).

Indeed, the Supreme Court of Georgia has repeatedly instructed that "a prior inconsistent statement is inadmissible in the absence of some showing that the witness who testified inconsistently at trial either had personal knowledge or had received information directly from one of the defendants themselves."[17] The state does not claim that it made either showing. And although competent evidence placed both Hart and Gaines at the trailer shortly after the robbery, Gaines testified that, in addition to Hart, there were "a couple [of] people" who also stopped by the trailer that night before the

---

[16] *Gibbons v. State*, 248 Ga. 858, 862 (286 SE2d 717) (1982) (emphasis supplied).

[17] *Sharpe v. State*, 272 Ga. 684, 686 (3) (531 SE2d 84) (2000), citing *Johnson v. State*, 260 Ga. 17, 19 (4) (389 SE2d 238) (1990); see also *Campbell v. State*, 263 Ga. 824, 826 (4) (440 SE2d 5) (1994).

residents returned home. Indeed, competent evidence showed that the individual who would serve as the CI was also there at that time and that he, too, interacted with Hart. The CI did not testify; and by several witnesses' accounts, he died prior to trial.

> The record in this case does not show how [Gaines] acquired his information; he could merely have been repeating rumors, or he might have acquired information second or third hand. It would have been error to allow [Gaines] personally to testify over objection about a crime of which he had neither personal knowledge nor information directly from . . . the defendant[ ] [himself]. The testimony of [the resident of the trailer] was no more admissible than [Gaines's] would have been, and the trial court erred by admitting it in evidence over [Hart's hearsay] objections.[18]

Notably, the hearsay testimony was the only direct "evidence" identifying Hart as the masked robber and shooter. And while there was sufficient competent evidence to authorize the jury's verdicts, the competent evidence identifying Hart as the perpetrator was not so overwhelming that we can conclude that "it is highly probable that the error did not contribute to the judgment."[19] Consequently, Hart's convictions must be reversed.

4. Given our conclusion in Division 3, Hart's remaining claims of error are moot.

*Judgment reversed. Miller, C. J., and Johnson, J., concur.*

### DECIDED JULY 15, 2010.

VALE LAW LIBRARY

---

[18] *Johnson*, 260 Ga. at 19. Cf., e.g., *Sharpe*, supra (trial court correctly admitted witness's prior inconsistent statements, where the witness had identified the appellant in her previous statements to the police as the source of her information); *Campbell*, supra (trial court correctly admitted witness's prior inconsistent statement, where witness claimed in his prior statement to police that he was an eyewitness to the crime).

[19] *Johnson v. State*, 238 Ga. 59, 61 (230 SE2d 869) (1976) (citation and punctuation omitted); see *Johnson*, supra, 260 Ga. at 19 (4) (applying the "nonconstitutional harmful error test" enunciated in *Johnson*, supra, 238 Ga. 59, to conclude that, although the evidence was sufficient, admitting hearsay that identified the defendant as perpetrator of crimes was reversible error, notwithstanding circumstantial evidence of identification); see *Render v. State*, 267 Ga. 848, 850 (2) (483 SE2d 570) (1997) (while it is undisputed that the appellant shot the victim, the evidence that he did so with malice, rather than in self-defense or accidentally, was not overwhelming; thus, the Court could not say that it was highly probable that admission of the inculpatory hearsay did not contribute to the verdict). Cf. *Williams v. State*, 277 Ga. 853, 854-855 (2) (596 SE2d 597) (2004) (admitting hearsay testimony of witnesses to establish prior difficulties between defendant and shooting victim was harmless error, where in light of overwhelming evidence that the defendant committed the murder, it was highly probable that admission of hearsay testimony did not contribute to verdict).

*Hube & Tucker, Matthew K. Hube*, for appellant.
*Richard A. Mallard, District Attorney, Daphne H. Jarriel, Assistant District Attorney*, for appellee.