## A00A0078. SIMS v. THE STATE.
(537 SE2d 133)

RUFFIN, Judge.

A Houston County jury found Kalvin Sims guilty of burglary. On appeal, Sims contends that the trial court erred by (1) permitting the State to introduce evidence of an impermissibly suggestive photo

---

lineup and subsequent in-court identification; and (2) granting the State's reverse *Batson* challenge. Sims also challenges the sufficiency of the evidence. For reasons that follow, we reverse.

On appeal from a criminal conviction, we view the evidence in the light most favorable to support the jury's verdict, and the defendant no longer enjoys the presumption of innocence.[1] So viewed, the record shows that on June 4, 1998, housekeeper Bonnie Rhoden arrived at her employer's house between 9:30 and 9:45 a.m. As she parked her car in the driveway, she heard a noise that sounded like a tool being dropped. Because the house was being remodeled, Rhoden assumed the noise had been made by someone working on the house. Rhoden noticed that the front door was closed.

As Rhoden walked around to the side door, she saw that a window had been broken. Initially, she attributed the break to the remodeling effort, but when she looked through the window and saw that the front door had been opened, she became suspicious. Rather than entering the house, she walked back to her car. As she reached her car, she saw a man leaving the woods behind the house and walking toward her. When she was approximately ten feet away from the man, she looked him in the face and said "hello." The man responded, "hello," and he continued walking toward a moped that was parked next to the garage. Rhoden, who was afraid to open her car door, walked past her car to the street corner. The man got on the moped and drove away.

Rhoden called her employer, Ann Clark, who called the police. Centerville Police Officer Ronald Coley responded to the call. Upon entering the house, Coley and Clark discovered that Clark's purse, which had contained between $10 and $20 in change, had been spilled on a countertop and that most of the change had been taken. Nothing else was missing from the house.

Rhoden described the man's race and said that he had a muscular build, was 5'6" or 5'8", and was wearing blue shorts, a white shirt tied around his waist, and white tennis shoes. She said the moped he had been riding was white and had a black seat with "POSH" written on the back. Coley, who remembered answering a call about a young girl riding a moped near Valencia Circle, broadcast the suspect's description and suggested that police look near Valencia Circle.

Police Officer Michelle Snyder began looking for the suspect. She spoke with Clark's neighbor, who reported seeing a man riding eastbound on a moped. Snyder drove around looking for the suspect before parking her patrol car in a store parking lot. At approximately 10:00 a.m., while Snyder was sitting in the parking lot, she saw Sims

---

[1] *Dunn v. State*, 238 Ga. App. 579 (1) (519 SE2d 503) (1999).

walking across a field toward the store. Sims wore a grayish-white T-shirt, long blue shorts, and white tennis shoes. Snyder also noticed a fresh scrape on the side of Sims' calf. Snyder and another officer stopped Sims and obtained his name, Social Security number, address, and the name of his employer. Snyder thanked Sims for the information, and he continued on his way.

Snyder gave the information to Centerville Police Lieutenant Joseph Pardo, who told her to go to Sims' home on Valencia Street, where she found Sims in his neighbor's yard helping her plant a rose bush. Pardo joined Snyder at Sims' house, and Pardo began asking Sims additional questions. A short time later, Coley drove Rhoden to Sims' house to see if she could identify him. He drove slowly past Sims, who was standing next to Pardo, and Rhoden said that "it looks like him," but that she could not be sure. She was unsure whether the shirt Sims was wearing was the same shirt she had seen earlier, and she thought the man she had seen earlier had been wearing a different pair of shorts. Coley then told Rhoden that they had enough information to arrest Sims.

Pardo conducted a pat-down search of Sims for safety purposes, and he found a $1 bill and $6.90 in change in Sims' pocket. Pardo searched for the moped but never found it.

Approximately one week after the burglary, Rhoden was asked to look at a photo lineup. Officer Pardo, who conducted the lineup, told Rhoden, "We've got the person in this lineup that we think did the burglary." Rhoden was then told to identify the person she saw "[a]t the house and at the drive-by," and she picked Sims. Rhoden asked Pardo whether she had picked the right person, and Pardo responded affirmatively. Sims was then charged with burglary.

At trial, Rhoden was asked, "Both based on [your] description [of Sims] and based on your recall of the events of June 4th can you identify the person that you ran into coming around [your employer's] house . . . ?" She pointed to Sims and said that she was "positive" he was the man she had seen leaving her employer's house.

1. In his first enumeration of error, Sims contends that the trial court erred in allowing evidence of the photo lineup, claiming that it was impermissibly suggestive. Sims also asserts that the trial court erred in failing to exclude Rhoden's in-court identification of him as the perpetrator, arguing that it was tainted by the pretrial identification procedures. We agree.

In determining whether identification evidence should be excluded, the threshold inquiry is whether the identification procedure was impermissibly suggestive. If so, then the court should consider whether there was a very substantial likelihood of irreparable

misidentification.[2] In the recent case of *Clark v. State*,[3] the Supreme Court held that "An identification procedure is impermissibly suggestive when it leads the witness to an all but inevitable identification of the defendant as the perpetrator, or . . . is the equivalent of the authorities telling the witness, 'This is our suspect.' "[4]

That is essentially what happened in this case. Based on a general description of the perpetrator, the police identified Sims as a suspect. The police then led Rhoden to their suspect for her to identify him one-on-one, a practice which has been widely condemned.[5] Rhoden was unable to positively identify Sims as the perpetrator despite seeing him shortly after the crime was committed. Notwithstanding Rhoden's tepid identification of Sims, the police told her that they had enough information to arrest him, which is, in essence, tantamount to telling the only eyewitness, "This is our man."

A week later, the police had Rhoden look at a photo lineup, and she was asked to identify the man she had seen at the house *and* at the drive-by. Rhoden picked Sims. She then asked the police whether she had gotten "the right one," and the police responded affirmatively.[6]

Pretrial identification procedures must "comport with certain minimum constitutional requirements in order to insure fairness."[7] Where the police tell the eyewitness who their suspect is, tell that witness the suspect is in the lineup, and then confirm that the witness chose the right person, we cannot say that the lineup comports with minimal constitutional standards. Thus, we find the pretrial lineup was impermissibly suggestive.

We also believe that the identification procedures employed were so suggestive as to give rise to a substantial likelihood of irreparable misidentification. In determining whether such substantial likelihood of irreparable misidentification exists, we look to the totality of the circumstances.[8] The factors we consider include:

(a) the opportunity of the witness to view the criminal at the time of the crime, (b) the witness' degree of attention, (c) the accuracy of the witness' prior description of the criminal, (d)

---

[2] *Barber v. State*, 236 Ga. App. 294, 295-296 (1) (512 SE2d 48) (1999).

[3] 271 Ga. 6 (515 SE2d 155) (1999).

[4] (Citation omitted.) Id. at 12 (7) (b).

[5] See *Banks v. State*, 216 Ga. App. 326, 328-329 (3) (454 SE2d 784) (1995).

[6] We note that "[i]t is not a good practice to indicate to a witness that [she] has chosen the 'right' person as it could lead to an improper tainting of a subsequent identification in a questionable case. . . . This practice of confirming the choice as correct is also disapproved." *Garner v. State*, 201 Ga. App. 574, 576 (1) (411 SE2d 503) (1991).

[7] (Punctuation omitted.) *Sherman v. State*, 225 Ga. App. 869, 871 (2) (485 SE2d 557) (1997).

[8] *Massaline v. State*, 234 Ga. App. 35, 36 (1) (506 SE2d 181) (1998).

the level of certainty demonstrated by the witness at the confrontation, and (e) the length of time between the crime and the confrontation.[9]

In this case, Rhoden testified that she was afraid when she saw the man walking toward her and that she tried to avoid staring at him. Although she did look at his face while saying "hello," she then averted her eyes. The details she gave to the police — the man's race and attire — were not particularly distinctive. Moreover, when she was taken to see Sims, she thought he was wearing different clothes than the perpetrator. And although she saw Sims less than an hour after the burglary, she only "thought" he might be the perpetrator, but she could not be certain. In view of Rhoden's inability to positively identify Sims shortly after the crime combined with the police officers' actions during both the showup and the photo lineup, we find that there was a substantial likelihood of irreparable misidentification.

We also agree that Rhoden's in-court identification of Sims was tainted. Whether an improper pretrial identification taints a subsequent identification depends on all the circumstances of a case.[10] Here, Rhoden's in-court identification of Sims was tainted for the same reasons the photo lineup was improper. Moreover, after Rhoden identified Sims in the pretrial lineup, the police told her that she was right, further tainting the in-court identification.

Even if a pretrial identification is tainted, however, an in-court identification may be admissible if it has an independent basis. At trial, Rhoden was asked "both based on [your] description and based on your recall of the events of June 4th, can you identify the [perpetrator]?" As the showup took place on June 4, it is unclear whether Rhoden was being asked whether she could recognize Sims based upon her recollection of the crime or the showup. Accordingly, we are unable to conclude that Rhoden's in-court identification of Sims had an independent origin.

Even if the trial court erred in admitting the pretrial identification, we will affirm the conviction if such error was harmless beyond a reasonable doubt.[11] Given the dearth of evidence supporting Sims' guilt, however, we cannot conclude that the error was harmless. Other than Rhoden's testimony, the only real evidence linking Sims to the crime was the fact that he had change in his pocket. This evidence is not particularly incriminating given the fact that the amount of change did not correlate with the amount allegedly

---

[9] (Punctuation omitted.) Id.

[10] *Garner*, supra.

[11] *Huff v. State*, 239 Ga. App. 83, 86 (1) (519 SE2d 263) (1999).

taken.[12] Accordingly, we reverse.

2. In view of our holding in Division 1, we need not address Sims' remaining enumerations of error.

*Judgment reversed. Ellington, J., concurs. Andrews, P. J., concurs specially.*

ANDREWS, Presiding Judge, concurring specially.

Although I agree that the preindictment one-on-one identification procedure used in this case crosses the line and was impermissibly suggestive and created a likelihood of irreparable misidentification, *Clark v. State*, 271 Ga. 6 (515 SE2d 155) (1999), I cannot concur with all that is said in the majority opinion concerning one-on-one showups.

While *Banks v. State*, 216 Ga. App. 326, 328-329 (3) (454 SE2d 784) (1995), does state that the "practice of showing suspects singly to a witness for identification purposes has been widely condemned, *Daniel v. State*, 150 Ga. App. 798 (1) (258 SE2d 604) (1979)," the remainder of that paragraph is:

> our appellate courts have consistently upheld the admission of in-court identifications when prior one-on-one showups are reasonably and fairly conducted at or near the time of the offense. (Cits.) [Cits.] Nevertheless, our court has recognized the inherent suggestibility of one-on-one showups. [Cit.]

(Punctuation omitted.) *Banks*, supra at 329.

Therefore, the mere use of a one-on-one showup does not equate with "impermissible" suggestibility but requires examination of the totality of the circumstances surrounding it.

In fact,

> " '(P)rompt on-the-scene confrontations and identifications, though inherently suggestive because of the presentation of a single suspect, (nevertheless) are permissible in aiding a speedy police investigation and . . . where possible doubts as to identification need to be resolved promptly, such on-the-spot identifications promote fairness by enhancing the accuracy and reliability of identification, thereby permitting expeditious release of innocent subjects. (Cit.)' [Cit.]"

---

[12] Compare *Dennard v. State*, 241 Ga. App. 794, 797 (527 SE2d 884) (2000) (defendant found with exact amount of food stamps and almost exact amount of money stolen from store).

*Smith v. State*, 235 Ga. App. 134, 137 (1) (508 SE2d 490) (1998) (one-on-one showup upheld even though conducted four days after the crime).

DECIDED JULY 7, 2000 

*Angela M. Coggins*, for appellant.
*Kelly R. Burke, District Attorney*, for appellee.