**March 30, 2016**

# In the Court of Appeals of Georgia

A15A1878. KING v. THE STATE.

BOGGS, Judge.

Travis King appeals from his convictions for armed robbery, aggravated assault, and two counts of possession of a weapon during the commission of a felony. He asserts that the trial court erred in the admission of evidence, in its charges to the jury, and by improperly commenting on the evidence. He also raises four grounds of ineffective assistance of counsel. For the reasons explained below, we affirm.

The record shows that a customer was at the counter of convenience store when a man entered the store and said, "[G]et down . . . this is a stickup." The customer turned around "and when [he] turned the gun hit [him]." Initially thinking that "somebody was teasing [him]," the customer threw [his] hand up," kicked the gun up, and said "get that s**t out of my face." The man cursed at the customer, placed the

gun into the customer's stomach, and forced him to the floor. After going to the floor, the customer could only hear what the gunman said. The gunman then demanded money and instructed the store clerk not to look at him. The clerk complied with the gunman's demands and called the police after the assailant left.

The robber wore a dark handkerchief tied around his nose and mouth, but "when he was talking it slipped down." The customer testified that "[i]t slid down just about here (pointing)." At another point in his testimony, he agreed that it slipped down to the chin, but did not explain where on the chin. The customer testified that he got "a good look at him" and informed the police, "if I ever see him or hear his voice again I would recognize him. You don't forget a person's voice or face when they put a double barrel in your stomach and cock it." He also testified that, based on his experience working for a telephone company for 25 years, he hears voices more than the average person. The customer, an avid sportsman, described the gun as "a double barrel sawed-off shotgun," approximately 19-20 inches long.

The police had no solid leads in their investigation for about a year,[1] until they received a letter from an inmate seeking a $100 reward because he overheard another

---

[1] At some point during this time period, the customer was shown a photographic line-up, which did not include King, and he did not identify any of the persons depicted as the robber.

2

inmate bragging about robbing the particular store involved. Although the letter did not name King, it contained enough information to enable the police to pinpoint King as a suspect. Specifically, the letter explained that the man would be getting out of jail in September and identified "where the man was from." The inmate never received a reward.

The investigating officer developed a photo array featuring King and five other men and showed it to the customer, who promptly identified King as his assailant. The victim testified that he "was 99 percent sure from the pictures, but [he] wanted to hear his voice because you never forget that voice." Based on this identification, King was arrested.

A few weeks later, the officer arranged for the customer to listen to King speaking in a different room, and the customer identified King's voice as that of the gunman. The customer testified, "I didn't know who the person was. . . . They never let me see him, they just let me hear his voice." The customer later heard the same voice three times on the telephone. He explained that he learned after the robbery that he and King are "distant relatives," and that he received collect phone calls from King. The first time he accepted the call, King asked "what [he] was going to do." The customer then replied "what do you think I'm going to do." He did not report

3

these conversations to the district attorney's office until he was "called in" months later.

The State charged King with armed robbery of the clerk, aggravated assault of the customer, possession of a sawed-off shotgun during the commission of an armed robbery, and possession of a sawed-off shotgun during the commission of an aggravated assault. Defense counsel filed a motion in limine to exclude evidence of the customer's pretrial photo identification of King on the ground that the photo array was prejudicial. Counsel also sought to prevent any in-court identification on the ground that it would be tainted by the photo array. Following a hearing, the trial court denied the motion.

At trial, the customer identified King as the man who had assaulted him and robbed the store, and the inmate identified King as the man he had overheard bragging about committing the crimes. The inmate also testified about the following details of the crime that he had learned from King: the robbery location, use of a sawed-off shot-gun, placing the gun in the man's stomach, telling the man to get on the floor, and taking around $6,500 in the robbery. The store clerk testified that the robber took $5,200 in cash and $1,500 in checks. On cross-examination, the inmate admitted that he had recently pled guilty to a cocaine charge.

4

Multiple defense witnesses testified that King's family hosted a neighborhood back-to-school party the evening that the robbery occurred. The party location was a 30-minute drive from the store that was robbed. The party was attended by 50-100 people and was located in the street "around the houses." As one neighbor acknowledged, "there was no way to see who was there all of the time." This neighbor left the party at 9:00 p.m., over an hour before the robbery, which occurred between 10:00 and 10:30 p.m. Another neighbor, who was also related to King and "real good friends" with him, claimed that he would have noticed if King had left the party for an hour, but would not have noticed if he left for five or ten minutes. Another also testified that King was present for the entire party, other than a trip to the store that lasted around five minutes.

King's sister testified that King was at the party the entire time, but acknowledged that she left the party between 10:00 and 11:00 p.m. Another neighbor testified that King was at the party, but remembered him collecting "money from the people who were there to go to the store and get some more beer and ice." He testified that King was gone no longer than five or ten minutes.

Finally, King's mother testified that the party ended between 10:30 and 11:00 p.m. and claimed on direct examination that King was there the entire time because

5

she "wouldn't let him leave" since he was the co-host. During cross-examination, she admitted that "[h]e left once to go get some ice." The mother also testified that the customer witness contacted her to ask that she pay money in exchange for him not testifying against her son. She admitted that they never met and that she never contacted the authorities about him attempting to extort money.

The jury found King guilty on all counts. He moved for a new trial, but the trial court denied the motion. This timely appeal followed.

1. King argues that the trial court erred in failing to exclude the customer's pretrial identification of him based upon the photographic line-up. "Evidentiary rulings are reviewed under an abuse of discretion standard, which . . . is different from and not as deferential as the clearly erroneous/any evidence standard of review. [Cit.]" *Reeves v. State*, 294 Ga. 673, 676 (2) (755 SE2d 695) (2014). The Supreme Court of Georgia has characterized the "abuse of discretion" standard as "at least slightly less deferential than the 'any evidence' test" and "not quite as deferential as the 'clearly erroneous' test." (Citations and punctuation omitted.) *Reed v. State*, 291 Ga. 10, 13 (3) (727 SE2d 112) (2012). It also explained that "sometimes the appellate courts find it necessary to use more than one standard of review to evaluate a single trial-court ruling. Thus, in various contexts, we accept factual findings unless they are

clearly erroneous and review a trial court's ultimate decision on the particular issue for abuse of discretion." (Citations and punctuation omitted.) Id. In this case, the trial court held a hearing on the motion to exclude the identification testimony and simply denied the motion without explanation. We therefore apply an abuse of discretion standard of review. See *Green v. State*, 291 Ga. 287, 293 (6) (728 SE2d 668) (2012).

(a) The first step of the analysis is to consider whether the line-up was *impermissibly* suggestive. Id. And "[i]n determining whether an identification procedure was fair, the question is not whether the array of photographs used by police could 'have been more nearly perfect.' [Cit.]" (Footnote omitted.) *Pinkins v. State*, 300 Ga. App. 17, 20-21 (684 SE2d 275) (2009). Here, as the dissent acknowledges, "[t]he men depicted in the array are all the same race and have the same general complexion and facial hair. . . ."[2] And while there are discernible differences between the quality of King's picture and the other five pictures in the photo line-up, our courts have "repeatedly held that slight differences in the size, shading, or clarity of photographs used in an identification line-up will not render the

---

[2] We cannot agree with the dissent's view that the facial features depicted in two of the pictures are "nearly imperceptible" and that it cannot be determined if another picture shows a bald man. All of the men in the line-up clearly have similar hairlines and their facial features are recognizable.

lineup impermissibly suggestive." (Citations and punctuation omitted.) *Green*, supra, 291 Ga. at 293 (6).

In cases where differences between the defendant's photograph compared to all of the other photographs in a lineup are used to argue that the trial court erred by admitting an identification, this court frequently has found no abuse of discretion because the trial court was authorized to conclude that the lineup was not *impermissibly* suggestive. See *Redding v. State*, 296 Ga. 471, 474 (4) (769 SE2d 67) (2015) (defendant's photograph "had a plain white background while the other photographs had identical gray backgrounds"); *Green*, supra, 291 Ga. at 293 (6) (defendant's photo "more of a close-up shot and has more detail than the other photos"); *Pinkins*, supra, 300 Ga. App. at 20-21 (defendant's "picture showed him with his head more tilted than any of the other men pictured in the lineup"); *Rutland v. State*, 296 Ga. App. 471, 474 (2) (675 SE2d 506) (2009) (defendant's photo less sharp than others in the lineup); *Brewer v. State*, 219 Ga. App. 16, 20 (6) (463 SE2d 906) (1995) (picture tone of defendant's photograph "demonstrably lighter than the other five persons"). Therefore, the mere fact that King's photograph itself is noticeably different from the others does not, without more, render the lineup impermissibly suggestive.

Indeed, a lineup is less likely to be found impermissibly suggestive when there are "physical differences in the photographs themselves (as opposed to the persons pictured in the photographs)." *Pinkins*, supra, 300 Ga. App. at 20. See also *Marshall v. State*, 285 Ga. 351, 352 (2) (676 SE2d 201) (2009) ("fact that defendant's photograph was the only one depicting a gold necklace did not make the photographic line-up unduly suggestive, 'especially when there are other individuals in the lineup having roughly the same characteristics and features as the accused' [Cit.]").[3] This is particularly true where there has been no suggestive police conduct when showing the photographic array to the witness. See *Pinkins*, supra at 21 (no indication that procedure used in showing the display to the witness was improper); *Rutland*, supra, 296 Ga. App. at 474 (no suggestion that suspect depicted in one of the six photographs shown); *Williams v. State*, 264 Ga. App. 115, 117 (1) (589 SE2d 676) (2003) (officer never suggested that defendant was the perpetrator).

In this case, it is undisputed that the line-up was not shown to the customer in an improper way. The detective testified that he did not tell the customer "anything

---

[3] We note that a witness viewing a lineup will likely be more focused on comparing the physical features of the persons depicted with his visual memory of the perpetrator than identifying different characteristics of the photographs themselves.

9

specific" about the lineup and merely asked him to look at it "to see if anyone on this page had committed the crime." He made no suggestions about which photographs the customer should or should not choose. The customer also testified that no one suggested what photograph he should select and that he selected King based on his memory.[4]  For all of the above-stated reasons, the trial court was authorized to conclude that the photograph lineup and concomitant procedures were not *impermissibly* suggestive.

(b) While it is not necessary to conduct the second step of the analysis, I believe that the trial court was also authorized to conclude from the evidence before it that there was no *substantial* likelihood of irreparable misidentification.

With regard to the customer's opportunity to view the robber at the time of the crime, he was adamant from his initial interview with the police that he got "a good

---

[4] While the police officer stated that he told the customer "we have a suspect in mind" when he telephoned him "to come look at some photos," this general statement did not render the line-up impermissibly suggestive. "Although a police officer displaying a lineup to a victim or witness should avoid telling the person that the lineup contains the police officer's suspect, such a statement does not make a lineup impermissibly suggestive since the very fact that a lineup is being conducted suggests that a suspect is contained therein." *Mobley v. State*, 277 Ga. App. 267, 270 (1) (626 SE2d 248) (2006). And here, the officer did *not* tell the customer that the suspect was in the particular lineup shown to him.

look at him" and that "if [he] ever see[s] him or hear[s] his voice again [h]e would recognize him. You don't forget a person's voice or face when they put a double barrel in your stomach and cock it." The customer was standing close enough to the robber for him to put the gun into his stomach. While he testified that the handkerchief over the robber's face did not slip down all the way during the robbery, he also explained "[i]t slid down just about here (pointing)." At one point, the customer agreed that it slipped down to the chin, but did not explain where on the chin. The trial court, rather than this court, had the benefit of seeing where the witness pointed and to evaluate his opportunity to view the robber's face.

I disagree with the dissent's view that the customer's "attention could not have been focused solely on the robber" because he was also able to describe the weapon. That an experienced hunter was able to describe the weapon does not exclude the possibility that at times his attention was focused solely upon the robber's face. And the customer's lack of eloquence in describing the robber's facial features should not render his testimony that he would never forget the robber's face meaningless. "Experience teaches . . . that many persons may lack the ability to articulate a detailed description of a person they have seen and yet can still identify him on sight." *Israel v. United States*, 521 F2d 1370, 1375 (I) (C) (7th Cir. 1975). And we have previously

11

concluded that no substantial likelihood of misidentification existed in a case in which the victim could not describe the perpetrator to the police but also testified "that he would recognize him if he saw him." *Garlington v. State*, 268 Ga. App. 264, 265 (9) (601 SE2d 793) (2004) The customer's statement that he would never forget the robber's face also shows a great degree of attention.

The customer testified that he was 99% certain after viewing the photographic lineup and that he told the police "if I ever hear his voice I will be absolutely 100 percent sure. . . . I wanted to hear his voice because you never forget that voice." A couple of weeks later, the police asked him to come and listen to a person's voice, and the customer identified it as the robber's voice. He testified that he "didn't know who the person was. . . . They never let me see him, they just let me hear his voice." The detective testified that the customer never had any hesitation before identifying King's photograph and that he was also able to identify King's voice.[5] While the line-up occurred one year after the robbery, this court has previously found no substantial likelihood of misidentification in cases involving significant lapses of time between the crime and the identification. See *Bonner v. State*, 278 Ga. App. 855, 856-857 (630

---

[5] In contrast, when the customer was previously shown another photographic line-up at a different point in the police investigation, he did not identify any of the persons depicted as the robber.

12

SE2d 127) (2006) (three months); *Qadir v. State*, 235 Ga. App. 884, 885 (2) (510 SE2d 362) (1998) (two months); *Cummings v. State*, 233 Ga. App. 806, 808-809 (4) (505 SE2d 73) (1998) (two years); *Crumbley v. State*, 189 Ga. App. 384, 385 (1) (375 SE2d 482) (1988) (five months).

Finally, we are not persuaded by the two cases relied upon by the dissent to support its view that the trial court abused its discretion by failing to conclude that there was a substantial likelihood of irreparable misidentification. See *Sims v. State*, 244 Ga. App. 823 (537 SE2d 133) (2000); *Banks v. State*, 216 Ga. App. 326 (454 SE2d 784) (1995). Both of these cases involved the more problematic show-up identification. In one, the witness was told by police that they had enough to arrest the defendant after she gave a "tepid identification" following a show-up identification. *Sims*, supra, 244 Ga. App. at 826 (1). They later asked her to identify in a photographic line-up the man she had seen during the crime *and* during the show-up. Id. In *Banks*, supra, the defendant was seated in a patrol car when the witness was asked to identify the perpetrator, the victim failed to describe the suspect as having a beard before the show-up, and explained this discrepancy by stating that he "could not see too well" and had not paid too much attention to the person's face. *Banks*, supra, 216 Ga. App. at 329 (3).

13

2. King claims that the trial court erred by admitting the customer's in-court identification of him because it was tainted by the allegedly suggestive line-up. This claim of error is rendered moot based upon our holding in Division 1.

3. King contends that the trial court erred in giving a jury instruction on a method of committing aggravated assault that was not alleged in the indictment. The record shows that the indictment alleged one of three alternative methods of committing aggravated assault. See former OCGA § 16-5-21 (a) (2001).[6] Specifically, that King "did unlawfully make an assault upon the person of [the customer] with a sawed off shotgun, a deadly weapon, by pointing said shotgun at the face and stomach of said [customer], placing said [customer] in reasonable apprehension of immediately receiving a violent injury."

---

[6] A person commits the offense of aggravated assault when he or she assaults:

(1) With intent to murder, to rape, or to rob;

(2) With a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury; or

(3) A person or persons without legal justification by discharging a firearm from within a motor vehicle toward a person or persons.

14

Relevant portions of the trial court's charge to the jury include:

He is charged with four counts. He is charged with armed robbery, aggravated assault, possession of a sawed-off shotgun during the commission of an armed robbery, and possession of a sawed-off shotgun during the commission of an aggravated assault.

The burden of proof rests upon the State to prove every material allegation of the indictment and every essential element of the crimes charged beyond a reasonable doubt.

Now, he is also charged with aggravated assault. And . . . in that connection I'm going to charge you the official Code of Georgia, Title 16-8-41, which reads in part: a person commits the offense of aggravated assault when that person assaults another person with the intent to murder, rape or rob; or with a deadly weapon; or with an object, device, or instrument which when used offensively against a person is likely to or actually does result in serious bodily injury.

To constitute an assault actual injury to the other person need not be shown. It is only necessary that the evidence show beyond a reasonable doubt an intention to commit injury on another person, coupled with the apparent ability to commit that injury, or that the other person was intentionally placed in reasonable apprehension of immediately receiving a violent injury from the defendant.

In that connection I charge you that under Georgia law a firearm, or in this instance if you believe a sawed-off shotgun, is a deadly weapon.

[I]f after considering the testimony and evidence presented [to] you, together with the charge of the court, you should find and believe beyond a reasonable doubt that this defendant in Upson County did on or about the date alleged in this indictment commit the offense of aggravated assault, as I have defined that for you, then you would be authorized to find the defendant guilty; and in that event the form of the verdict would be: We the jury, find the defendant guilty of . . . aggravated assault.

. . .

Now jurors, you're going to have this indictment form out with you . . . . don't begin your deliberations until I've sent to you the indictment, the various pieces of evidence that have been submitted, as well as some paper to complete the other three verdicts on.[7]

It is well-established that "[a] criminal defendant's right to due process may be endangered when, as here, an indictment charges the defendant with committing a crime in a specific manner and the trial court's jury instruction defines the crime as

---

[7] The trial court instructed the jury to place its verdict for the armed robbery charge on the reverse side of the indictment, and its verdict for the other three charges on blank paper that would be provided.

16

an act which may be committed in a manner other than the manner alleged in the indictment. [Cits.]" *Harwell v. State*, 270 Ga. 765, 766 (1) (512 SE2d 892) (1999). A jury instruction deviating from the indictment will violate due process if "there is evidence to support a conviction on the unalleged manner of committing the crime and the jury is *not* instructed to limit its consideration to the manner specified in the indictment. [Cit.]" (Emphasis supplied.) Id. "And in determining whether a charge contained error, 'jury instructions must be read and considered as a whole.'" (Citations and footnote omitted.) *Holman v. State*, 329 Ga. App. 393, 400 (2) (b) (ii) (765 SE2d 614) (2014).

While evidence was presented in this case to support a conviction on an unalleged manner of committing the crime (assault with intent to rob), the jury was instructed that the State was "required to prove every material allegation of the indictment and every essential element of the crimes charged beyond a reasonable doubt." Additionally, the trial court read the indictment to the jury at the beginning of the trial and also sent it out with them during their deliberations. "Taking the charge as a whole, we conclude that a jury of average intelligence would not have been confused by the charge, and that the trial court's charge properly set forth the basis on which the jury was authorized to convict [King] on the count of [aggravated

17

assault].” (Citations, punctuation and footnote omitted.) *Clemens v. State*, 318 Ga. App. 16, 20 (2) (733 SE2d 67) (2012). See also *Holman*, supra, 329 Ga. App. at 400 (2) (b) (ii) (defect in charge “cured by the jury being provided with the indictment” and the instruction “that the State must prove beyond a reasonable doubt all material allegations in the indictment and all essential elements of the crimes charged”); *Boatright v. State*, 308 Ga. App. 266, 272-273 (1) (e) (707 SE2d 158) (2011) (same).

4. King asserts that the trial court improperly commented on the evidence in violation of OCGA § 17-8-57. During trial, the following colloquy took place between the trial court, the prosecutor, and the inmate who testified that King bragged about robbing the convenience store:

[The State:] Okay. Now, on or about August of 2002, okay, did you have an occasion to hear a conversation that Mr. King was having?

[Witness:] Yes, sir.

[The State:] And do you see Mr. Travis King in this courtroom?

[Witness:] Yes, sir.

[The State:] Can you identify him for me please, sir.

[Witness:] (Pointing.)

[The State:] Let the record reflect he's identified the defendant.

[The court:] So noted.

Former OCGA § 17-8-57, applicable to King's 2003 trial, provided in part: "It is error for any judge in any criminal case, during its progress or in his charge to the jury, to express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused." Here, however, the trial court's two-word response to the prosecutor's request did not express or intimate an opinion as to what had or had not been proved. As King concedes, the witness identified King as the person who "confessed to him while he was incarcerated in the prison system," and the trial court used the customary language to let the record reflect that he did so. See *Ford v. State*, ___ Ga. ___ (5) (Case No. S15A1626; decided March 7, 2016) (where ballistics expert testified that bullets retrieved from decedents' bodies were fired from a .40 caliber gun, trial court's statement that "there is evidence that the gun that shot the bullets that killed these people were .40 caliber," was not an opinion about the veracity of the evidence itself); see also *Lobdell v. State*, 256 Ga. 769, 774 (8) (353 SE2d 799) (1987) (finding trial court's questions to witness clarifying her

19

identification of defendant after she testified merely that he was "present in court" were not improper). This enumeration is therefore without merit.

5. King argues that the trial court erred in giving an *Allen*[8] charge using language disapproved by the Georgia Supreme Court. In *Burchette v. State*, 278 Ga. 1 (596 SE2d 162) (2004), the Georgia Supreme Court held "that the statement that the case 'must be decided by some jury' is inaccurate," and should no longer be used in the *Allen* charge. Id. at 2-3. But King was tried in 2003, a year before the decision in *Burchette*, "which is prospective in its application, and therefore does not control here. The question remains, however, whether the instruction given in this case is so coercive as to cause a juror to abandon an honest conviction for reasons other than those based upon the trial or the arguments of other jurors." (Citation and punctuation omitted.) *Widner v. State*, 280 Ga. 675, 677-678 (3) (631 SE2d 675) (2006).

The record reveals that the jury was charged and then began deliberations at 2:56 p.m. The jury returned to the courtroom at 4:55 p.m., and the court asked the foreperson, "I am certainly aware that it is now right at 5:00 o'clock, and I want to do whatever this jury wants to do. First I want to know do you want to stay awhile longer

---

[8]See *Allen v. United States*, 164 U. S. 492, 501 (9) (17 SCt 154, 41 LE 528) (1896).

20

tonight? Or do you want to come back tomorrow?" The foreperson replied, "I would rather stay longer tonight, Your Honor, not come back tomorrow." But when the court asked if the jury was making some progress, the foreperson said, "No, sir," and informed the court that the vote was "[e]leven, one." When the court again asked the foreperson if it "would be good . . . to stay awhile longer tonight," the foreperson responded "I don't think we'll reach a decision tonight." The court then dismissed the jury for the evening and announced that the court would reconvene at 8:30 a.m. the next morning. Before the jury began to deliberate the next morning, the court found it appropriate to instruct the jury as follows, in light of the foreperson's statement the day before that the vote was "[e]leven, one," and that they had been considering this case for a considerable time:

> It is the law that a unanimous verdict is required. And while this verdict must be the conclusion of each juror and not a mere acquiescence of jurors in order to reach an agreement, it is still necessary for all of the jurors to examine the issues and questions submitted to them with candor and fairness and with proper regard for and in deference to the opinion of each other. A proper regard for judgment of others will greatly aid us in forming our own judgment.

21

Now, this case has - - *must be decided by some jury* selected in the same manner that this jury was selected. And there is no reason to think that a jury better qualified than you could ever be chosen.

Each juror must listen to the arguments of the others with a disposition to be convinced. If the members of the jury differ in their view of the evidence the difference of opinion should cause them all to scrutinize the evidence more closely and to reexamine the grounds of your opinions.

Your duty is to decide this issue which has been submitted to you, if you can conscientiously do so. In conferring you should lay aside all mere pride or opinion and bear in mind that the jury room is no place for taking up and maintaining in a spirit of controversy either side of the cause.

You should ever bear in mind that as jurors you are not to be advocates for either side. The aim to keep in view is the truth as it appears from the evidence, and only from the evidence that took place in this case, and to examine that in light of the instructions and the law that I have given you.

At this time, Madam Foreperson, and jurors, I'm going to ask you to go back to the jury room and continue your deliberations. You may retire.

22

(Emphasis supplied.) Fifteen minutes after the jury returned to deliberating after the overnight break, the foreperson announced that the jury had reached a verdict. And following the verdict, the jury was polled and each juror affirmed the verdict reached.

Just as in *Burchette*, supra, "because the 'must-be-decided' language constituted but one small portion of an otherwise balanced and fair *Allen* charge, it did not render the charge impermissibly coercive." (Citations and footnote omitted.) 278 Ga. at 3. The court

> cautioned the jurors that the verdict was not to be mere acquiescence of the jurors in order to reach an agreement, that any difference of opinion should cause the jurors to scrutinize the evidence more closely, and that the aim was to keep the truth in view as it appeared from the evidence, considered in light of the court's instructions . . . the judge, though firm in admonishing the importance of juries making verdicts, was careful not to intimate or express any opinion as to the propriety of any particular verdict, nor did he make any suggestion tending to coerce any particular group of jurors to agree with the others.

(Citations and punctuation omitted.) *Scott v. State*, 281 Ga. App. 106, 111 (3) (635 SE2d 582) (2006).

King argues that proof of the coercive nature of the court's instruction is shown by the fact that the jury returned a verdict 15 minutes after being given the charge. In

23

*Lowery v. State*, 282 Ga. 68 (646 SE2d 67) (2007), the Georgia Supreme Court determined that as a matter of law, similar inaccurate language in an *Allen* charge did not make the charge coercive because it was "but one small portion of an otherwise balanced and fair *Allen* charge. [Cit.]" Id. at 71-72 (4) (a). The court then declined to address "appellant's effort to establish coercion by comparing the length of jury deliberations before and after the *Allen* charge was given." Id. at 72 (4) (a). The court held that the

> [a]dditional factors mentioned in *Burchette* — the length of jury deliberations before and after the *Allen* charge and the jurors' reaffirmation of their verdict when polled — do not render a non-coercive charge coercive. Rather, these factors play an important role in determining coerciveness when there is a possibility the charge could be coercive, i.e., when it has not been determined as a matter of law that the charge is not coercive.

Id. We have made such a determination here. Even if this case had presented the *possibility* that the *Allen* charge was coercive, we have held in a case with no evidence of the length of deliberations before and after the *Allen* charge, that there was no showing of coercion where, as here, the jury was polled following the verdict and each juror affirmed his or her verdict. *Drogan v. State*, 272 Ga. App. 645, 648 (2) (613 SE2d 195) (2005).

24

Under these circumstances, the *Allen* charge was not coercive and therefore does not provide a basis for reversal.

6. King contends that he received ineffective assistance of counsel based upon his trial attorney's (a) failure to obtain and present expert testimony on the issue of eyewitness identification; (b) request of a jury charge that included consideration of a witness's level of certainty; (c) failure to object or move to exclude evidence of the pre-trial voice identification by the customer; and (d) failure to move to exclude cumulative and bolstering testimony by a police officer. In ruling on a claim of ineffective assistance,

> [u]nder the two-part test established in *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984), [King] must prove both that his trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance. If an appellant fails to meet his burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong.

(Citations and punctuation omitted.) *Harrison v. State*, 313 Ga. App. 861, 865 (3) (722 SE2d 774) (2012).

> As a general rule, reasonable trial tactics and strategies do not amount to ineffective assistance of counsel. The decisions on which witnesses

25

to call and all other strategies and tactical decisions are the exclusive province of the lawyer after consultation with his or her client. Whether an attorney's trial tactics were reasonable is a question of law, not fact. When assessing the reasonableness of counsel's actions, a court must evaluate counsel's performance from his or her perspective at the time of trial. This Court reviews a trial court's ruling on an ineffective assistance claim on appeal by accepting the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts. [Cits.]

*Hughley v. State*, 330 Ga. App 786, 791 (4) (769 SE2d 537) (2015). "When reviewing a claim that trial counsel's performance was deficient, this Court applies a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance. This presumption is particularly difficult to overcome where, as here, trial counsel is not available to testify." (Citations and punctuation omitted.) *Jones v. State*, 296 Ga. 561, 567 (4) (769 SE2d 307) (2015). That trial counsel is unavailable due to her untimely death following the trial "does not relieve [King] of his heavy burden of proving ineffective assistance of counsel." (Citation and punctuation omitted.) *Hicks v. State*, 295 Ga. 268, 276 (3) (b) n. 7 (759 SE2d 509) (2014).

(a) We find no merit in King's claim that trial counsel was ineffective for failing to present an expert witness on eyewitness identification. As the Supreme Court recognized in *Glass v. State*, 289 Ga. 542 (712 SE2d 851) (2011),

> [t]he holding in *Johnson v. State*, 272 Ga. 254 (526 SE2d 549) (2000), concerning testimony of an expert in eyewitness identification does not stand for the proposition that defense counsel is *required* to call an expert witness at trial where one of the primary issues involved is eyewitness identification of the defendant, let alone the proposition that the failure to call such an expert witness amounts to ineffective assistance.

(Citations and punctuation omitted; emphasis in original.) Id. at 549 (6) (d). Here, we must presume that trial counsel made a strategic decision not to call an expert witness, and "trial tactics and strategy, however mistaken they may appear with hindsight, are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them." (Citation and punctuation omitted.) *Villegas v. State*, 334 Ga. App. 108, 111 (2) (778 SE2d 363) (2015).

This court has previously recognized valid strategic reasons for deciding not to present such an expert. In *Breland v. State*, 287 Ga. App. 83 (651 SE2d 439) (2007), "trial counsel testified she chose not to pursue evidence of an expert in

27

eyewitness identification because she feared that doing so would have prompted the state to do the same, which she believed ultimately would have harmed [the] defense." Id. at 88 (3). We concluded that "[t]rial counsel's tactical decision that the risks of introducing such expert evidence outweighed its potential benefits did not constitute deficient performance." Id. See also *Winfield v. State*, 278 Ga. App. 618, 620-621 (2) (629 SE2d 548) (2006) (trial counsel's strategic decision not to hire expert to testify about unreliability of eyewitness identifications based upon photographic lineups did not amount to ineffective assistance). Accordingly, we cannot conclude that trial counsel's decision not to present expert testimony was so patently unreasonable that no reasonable attorney would have made a similar decision.

(b) King contends that trial counsel erred by requesting a jury charge that advised the jury to consider a witness's level of certainty. At the time this case was tried in 2003, the Supreme Court's decision in *Brodes v. State*, 279 Ga. 435 (614 SE2d 766) (2005) (instructing trial courts to refrain from charging on a witness's level of certainty), had not yet been decided. Id. at 443. "There is no general duty on the part of defense counsel to anticipate changes in the law. . . ." (Citations, punctuation and footnote omitted.) *Rickman v. State*, 277 Ga. 277, 280 (2) (587 SE2d

28

596) (2003). Although the Georgia courts may sometimes apply a new decision to cases already tried,

> that does not alter the long-standing precedent that, when addressing a claim of ineffectiveness of counsel, the reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial. Thus, a new decision does not apply in a manner that would require counsel to argue beyond existing precedent and anticipate the substance of the opinion before it was issued.

(Citation and punctuation omitted.) *Williams v. Rudolph*, 298 Ga. 86, 89 (777 SE2d 472) (2015). After examining trial counsel's perspective at the time of trial, including the fact that the requested charge was then a pattern jury instruction, we cannot conclude that trial counsel was ineffective for failing to anticipate the Supreme Court's decision in *Brodes*, supra.[9] And, even if we were to assume that trial counsel

---

[9] King cites to the following footnote in *Brodes*, supra, to support his contention that counsel should not have requested the level of certainty portion of the pattern charge: "Our [2000] observation [of a split of opinion among state appellate courts] caused the editors of the third edition of the criminal volume of the Suggested Pattern Jury Instructions to insert a cautionary note concerning the use of the 'level of certainty' portion of the charge. Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, Par. 1.35.10 (c), pp. 27-28 (3rd ed. 2003)." 279 Ga. at 436-437 n. 3. However, we cannot determine from the Supreme Court's opinion exactly when in 2003 the third edition was issued, and King submitted no evidence that this edition was issued before the date of his trial in 2003. Additionally, the 2000 decision referenced by the Supreme Court in *Brodes*, supra, pretermitted whether the level of

29

performed deficiently by requesting the pattern jury charge, King cannot show that he was prejudiced by the request given other evidence linking him to the crime. See *Rabie v. State*, 294 Ga. App. 187, 194 (5) (b) (668 SE2d 833) (2008) (ineffective assistance claim based upon requesting level of certainty charge failed where "there was evidence in addition to [eyewitness] identification which linked [defendant] to the robbery"); *Peeler v. State*, 286 Ga. App. 400, 404 (2) (b) (649 SE2d 775) (2007) (ineffective assistance of counsel claim failed where evidence in addition to eyewitness identification linked defendant to crime). In this case, King's jailhouse admissions also linked him to the crimes.

(c) King argues that trial counsel was ineffective because she did not object or move to exclude evidence of the pre-trial voice identification by the customer. Again, we must presume that trial counsel made a strategic decision not to move to exclude this evidence or object to its admission at trial. *Thomas v. State*, 273 Ga. App. 357, 362 (4) (b) (615 SE2d 196) (2005) (presuming trial counsel made strategic decision not to file a motion to suppress identification based upon suggestive photo array).

---

certainty charge should be continued and "note[d] that while some courts have discontinued the use of such a charge, . . . other courts continue to include the 'level of certainty' language in their charge on eyewitness identification." *Jones v. State*, 273 Ga. 213, 219 (3) (b) n. 17 (539 SE2d 143) (2000).

30

And we cannot conclude that such a strategic decision would be patently unreasonable. "Although one-on-one show-ups have been sharply criticized, and are inherently suggestive, the identification need not be excluded as long as under all the circumstances the identification was reliable notwithstanding any suggestive procedure." *Jefferson v. State*, 206 Ga. App. 544, 546 (2) (425 SE2d 915) (1992). The customer identified King's voice after previously identifying him in a photo array that we have concluded was *not* impermissibly suggestive. Here, the customer asked to hear a voice to confirm his visual identification, the voice identification procedure was conducted separately from the photographic line-up, he did not view King while listening to the voice, the words spoken by King were not the same as those used in the robbery, and he was 100% certain of his voice identification after being 99% certain of his identification of King in the photograph line-up. Consequently, "the subsequent [voice] show-up may be characterized as merely confirmatory and therefore reliable, despite the suggestive procedure." *Gibbs v. State*, 403 S.C. 484 (744 SE2d 170) (2012). See also *Israel*, supra, 521 F2d at 1374 (I) (A) ("[w]here as here, the victim heard the voice of a suspect after she had identified him by sight, [a show-up identification] is probably less objectionable than if she had not yet identified him").

31

Under these circumstances, there was no substantial likelihood of misidentification, and the failure to file a meritless motion cannot amount to ineffective assistance of counsel. *Lupoe v. State*, 284 Ga. 576, 580 (3) (f) (669 SE2d 133) (2008). Moreover, based upon the customer's pretrial and in-court identifications, as well as King's jailhouse admission, we conclude that King cannot demonstrate prejudice from counsel's alleged shortcoming in failing to seek exclusion of the voice identification. See *Campbell v. State*, 228 Ga. App. 258, 261-262 (2) (c) (491 SE2d 477) (1997) (finding any error in admission of voice identification harmless because "the victim had unequivocally identified [the defendant] in a photo line-up").

(d) In his remaining claim of ineffective assistance, King asserts that trial counsel should have objected to the police officer's testimony about the customer's pretrial visual and voice identifications. "[A] decision not to object is usually a matter of trial strategy that will not amount to a valid claim of ineffective assistance of counsel." *Hudson v. State*, 325 Ga. App. 810, 815 (1) (e) (755 SE2d 209) (2014). Here, we must presume that counsel made a strategic decision not to object to this testimony, and we cannot conclude that such a decision would have been patently unreasonable. See *Ellis v. State*, 292 Ga. 276, 286-287 (4) (e) (736 SE2d 412) (2013)

(presuming counsel's choice not to object was strategic); *Heard v. State*, 296 Ga. 681, 685 (3) (c) (769 SE2d 917) (2015) (rejecting ineffective assistance of counsel claim because trial counsel's failure to impeach witness with prior inconsistent statements presumed to be strategic); *Ponder v. State*, 332 Ga. App. 576, 586 (2) (b) (774 SE2d 152) (2015) (rejecting ineffective assistance of counsel claim because trial counsel articulated a strategic decision for not objecting to testimony that bolstered the victim's testimony).

*Judgment affirmed. Doyle, C. J., Andrews, P. J., Ellington, P. J.,and Branch, J. concur. Miller, P. J., concurs specially and in the judgment only. Phipps, P. J., concurs fully in Divisions 3, 4 and 5; concurs in the judgment only in Division 6; and dissents in Divisions 1 and 2.*

A15A1878. KING v. THE STATE.

MILLER, Presiding Judge, concurring specially.

I fully concur in the majority's opinion in Divisions 1 (b), 2, 3, 4, 5, and 6. I write separately, however, because I disagree with the majority's conclusion in Division 1 (a) that the photo array was not impermissibly suggestive. After a review of the record, I find that the photo array used in this case was very troubling and unduly suggestive. Accordingly, the trial court should have excluded this evidence. Nevertheless, the witness's subsequent independent voice and in-court identification of King as the perpetrator cured the taint resulting from the impermissible photo array. I would therefore affirm King's conviction.

The Due Process Clause protects a defendant from "the admission of evidence deriving from suggestive identification procedures." *Neil v. Biggers*, 409 U. S. 188, 196 (III) (93 SCt 375, 34 LEd2d 401) (1972). Thus, it is crucial that "pre trial identification procedures comport with certain minimal constitutional requirements in order to insure fairness." *Ralston v. State*, 251 Ga. 682, 683 (2) (309 SE2d 135) (1983). Whether such evidence should be excluded involves a threshold inquiry into

"whether the identification procedure was impermissibly suggestive." *Gravitt v. State*, 239 Ga. 709, 710 (3) (239 SE2d 149) (1977).

1. The photo array

The photo array shown to the witness in this case was, in my view, impermissibly suggestive as a matter of fact, and as a matter of law. The multiple differences between King's photo, on the one hand, and the other five photos, on the other, immediately draw the viewer to King's eyes and inevitably lead the viewer to conclude that one photo – King's – was that of the suspect.

In looking at the six photos included in the array, the viewer immediately notices that King's eyes are brighter and more distinctive. From there, one sees that the shading in the other five photos is darker. A grainy film is obvious over the other men's photos. In all but King's photo, the pictures were clearly cut out from another document. Additionally, in two of the images, it is nearly impossible to determine the facial features of those individuals.

In contrast, King's photo is clear. It has a white background, without any shading or grainy filter. King's features are pronounced. Thus, looking at the array, one's eyes are immediately drawn to King's photo with the "all but inevitable identification of [King] as the perpetrator." (Citation and punctuation omitted.)

2

*Williams v. State*, 275 Ga. 622, 623 (2) (571 SE2d 385) (2002); see also *Clark v. State*, 271 Ga. 6, 12 (7) (b) (515 SE2d 155) (1999).

Under the relevant case law, "slight differences in the size, shading, or clarity of photographs . . . will not render the lineup impermissibly suggestive." *Redding v. State*, 296 Ga. 471, 474 (4) (769 SE2d 67) (2015). In *Redding*, the Court went on to conclude that, having viewed the photo array at issue, "the lighter background in general, and the background in Redding's photograph in particular, does not *without more* render the lineup impermissibly suggestive."[10] (Emphasis supplied.) Id. In King's case, there is not just a single difference, and it is the differences in combination that make the array troubling. I thus conclude that this case clearly presents the "more" that shifts a permissible photo array into one that was impermissibly suggestive and highly prejudicial. It was therefore error for the trial court to admit this photo identification into evidence.

2. Independent identification

[10] It is all the more difficult to distinguish that line between permissible and impermissible arrays because, although the case law instructs that "slight differences" do not cross that line, see *Redding*, supra, 296 Ga. at 474 (4), we are not privy to the images in those prior cases and thus cannot compare apples to apples. As the saying goes, "beauty is in the eye of the beholder." Margaret Wolfe Hungerford, *Molly Bawn* (1878). And we are not able to behold those images. Nevertheless, in my eye, the images in King's array show more than "slight differences" and thus cross the line.

An "in-court identification is not constitutionally inadmissible if it does not depend upon the prior identification but has an independent origin." *Wilson v. State*, 275 Ga. 53, 59 (3) (562 SE2d 164) (2002). "The primary evil to be avoided is the substantial likelihood of irreparable misidentification." Id. (citing *Coleman v. Alabama*, 399 U. S. 1 (90 SCt 1999, 26 LEd2d 387) (1970)). There is no likelihood of irreparable misidentification here.

After the robbery, the witness told police, "[I]f I ever see him or *hear his voice* again I would recognize him." He similarly later told police that, if he ever heard the robber's voice, he would be "*absolutely 100 percent sure*." When later asked to listen to the voice of a suspect – whom police did not identify and whom the witness could not see – the witness identified King's voice as that of the robber without hesitation.

Moreover, at trial, the witness identified King as the robber. When asked "have you ever been uncertain at all about your identification," the witness immediately responded, without qualification, "No, I haven't. You don't forget that." See *Wilson, supra*, 275 Ga. at 59 (3) (considering witnesses' statements that they were certain of their identifications).

The witness's certainty in identifying King in court, when viewed in light of his equally certain identification of King's voice, shows that the in-court

4

identification was sufficiently independent of the photo array to satisfy due process. *Biggers*, supra, 409 U. S. at 196 (III). Considering all of the circumstances, the suggestiveness of the photo array did not taint the subsequent, independent, in-court and voice identification of King. See *Coleman v. Alabama*, 399 U. S. 1, 4 (I) (90 SCt 1999, 26 LEd2d 387) (1970). Accordingly, I would affirm King's convictions.

A15A1878. KING v. THE STATE.

PHIPPS, Presiding Judge.

I concur fully in Divisions 3, 4, and 5 of the majority opinion. But because I believe the trial court committed reversible error by failing to exclude the customer's pretrial photographic and in-court identifications of King as the perpetrator, I respectfully dissent from Divisions 1 and 2. I concur in the judgment only as to Division 6.

"On appeal, we will reverse a conviction based on a pretrial photo identification if the photographic lineup was so impermissibly suggestive that there exists a very substantial likelihood of irreparable misidentification."[1] A photo array is impermissibly suggestive "if it leads the witness to an all but inevitable identification of the defendant as the perpetrator, or is the equivalent of the authorities telling the witness, 'This is our suspect.'"[2] As the majority notes, we review for abuse of discretion the trial court's denial of a motion to exclude evidence of a pretrial

---

[1] *Jones v. State*, 303 Ga. App. 366, 367 (1) (693 SE2d 549) (2010) (punctuation and footnote omitted).

[2] Id. (punctuation and footnote omitted).

photo identification.[3] And while "abuse of discretion" is a deferential standard of review, it "is not toothless"[4] and does not "require the appellate courts to rubber-stamp" the trial court's decision.[5]

1. In Division 1 (a) of its opinion, the majority concludes that the photo array in this case was not impermissibly suggestive because "slight differences in the size, shading, or clarity of photographs used in an identification line-up will not render the lineup impermissibly suggestive."[6] But the array in this case involves five qualitatively homogenous photographs of men who were not suspects, and one photograph—King's—that plainly differs from all the others in terms of shading, clarity, background, and level of contrast. Accordingly, the array was the equivalent of the police telling the customer that King was their suspect.

The array, which was included in the record exactly as it was shown to the customer, contains six black-and-white headshots mounted on a manila folder in two

---

[3] See *Lovelady v. State*, 307 Ga. App. 788, 790 (706 SE2d 148) (2011).

[4] *Reed v. State*, 291 Ga. 10, 13 (727 SE2d 112) (2012) (citation and punctuation omitted).

[5] *Frazier v. State*, 305 Ga. App. 274, 283 (699 SE2d 747) (2010) (Barnes, P. J., concurring in part and dissenting in part).

[6] *Green v. State*, 291 Ga. 287, 293 (6) (728 SE2d 668) (2012) (728 SE2d 668) (2012) (citations and punctuation omitted).

2

rows of three. The men depicted in the array are all the same race and have the same general complexion and facial hair, but King's picture differs markedly in quality from the other five.[7] The other five are photocopies that appear to have been cut and pasted onto a separate sheet of differently-toned paper, as a scissored gray halo outlines these men's heads. Moreover, their images show minimal contrast between light and dark and are of such poor quality that their features are difficult to discern.[8] King's picture, on the other hand, has no gray halo and displays a keener contrast between light and dark that renders his features—particularly his eyes—far more prominent than those of the other men. Consequently, the viewer's attention is immediately drawn to King's image, and the obvious conclusion is that it was taken at a different location or with a different camera than all the rest.[9]

---

[7] The majority writes that "a witness viewing a lineup will likely be more focused on comparing the physical features of the persons depicted with his visual memory of the perpetrator than identifying different characteristics of the photographs themselves." Supra at 10 (1) (a). But the majority provides no citation to authority or evidence to support this speculation. Even assuming that the customer could ignore the quality of the photographs in favor of their content, his ability to make a meaningful comparison of the men's physical features was severely hampered by the poor quality of all the images save King's.

[8] For example, one of the men may or may not be bald, and the facial features of two others are so monochromatically gray that they are nearly imperceptible.

[9] Indeed, the officer testified that he obtained King's picture from another jurisdiction, whereas the other five came "from [his] files."

The combination of conspicuous differences unique only to King's picture distinguish this case from those cited by the majority, which involved only minor variations among one or two image qualities.[10] This is not a case in which multiple pictures all differ from each other in quality, suggesting that the police obtained them from various sources; here, there are five pictures with the same background, tone, shading, clarity, and level of contrast, and only *one* picture—King's—that looks different. Nor is this a case in which the only difference between King's image and the others is one of shading or tone, as all the pictures except for King's are far less

_____

[10] For example, in *Green*, the defendant objected that his picture in two photo arrays used to identify him was "more of a closeup shot and ha[d] more detail than the other photos." Id. The Supreme Court rejected this claim after viewing the arrays and concluding that the differences to which the defendant referred were "indeed slight" and that "his photograph [wa]s not the only one in each array with as much clarity." Id.; see also *Pinkins v. State*, 300 Ga. App. 17, 19 (684 SE2d 275) (2009) (qualitative differences between defendant's photo and the others did not invalidate lineup because they were "slight" *and* because witnesses were told before viewing lineup not "to be distracted by any background scenery, since photographs are sometimes taken at various locations or obtained from a variety of sources"); *Rutland v. State*, 296 Ga. App. 471, 474 (2) (675 SE2d 506) (2009) (detective who had assembled array effectively minimized slight differences in picture quality by using a computerized process to enlarge defendant's photo and produce the lineup in black and white "to provide more uniformity in the color, quality, and background of the photos"); *Brewer v. State*, 219 Ga. App. 16, 20 (463 SE2d 906) (1995) (our review of the array showed that defendant's contention that "the picture tone of his photograph in the six-person array was demonstrably lighter than the other five"—the only difference mentioned by defendant—was "without merit").

4

clear and also contain an unmistakable scissored outline indicating that they were cut and pasted onto a different background. Finally, rather than being "slight," the differences here are sufficiently pronounced that the viewer quickly realizes that five of the photographs came from one source, whereas King's, alone, was obtained elsewhere. In short, "one of these things is not like the others."[11]

Because King's picture is the only one that stands out in these multiple, immediately visible ways, is the only one that differs in any qualitative way from the others, and arguably is the only one in which the image is shown with sufficient clarity to enable an identification, the array effectively proclaimed that King was the police's suspect. Therefore, the array was impermissibly suggestive, and the trial court erred by finding otherwise.

2. The next question is whether, under the totality of the circumstances, the impermissibly suggestive photo array led to a substantial likelihood of irreparable misidentification.[12] Factors relevant to this inquiry include

(1) the witness's opportunity to view the accused at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the

_____

[11] Joe Raposo and Jon Stone, One of These Things, on Sesame Street Book & Record—Original Cast (Columbia Records, 1970).

[12] See *Heng v. State*, 251 Ga. App. 274, 276 (2) (554 SE2d 243) (2001).

5

witness's prior description of the accused; (4) the witness's level of certainty at the confrontation with the accused; and (5) the length of time between the crime and the confrontation. The ultimate question is, whether under the totality of the circumstances, the identification is reliable.[13]

Here, the only factor weighing in favor of the reliability of the customer's pretrial identification is his claim that he was certain of it.[14] The other factors uniformly go the other way.

The customer had little opportunity to view the robber. The entire incident lasted only a few minutes, and for half of that time, the customer was on the floor and had been told not to look up. The robber's face was covered from the nose down by a dark handkerchief. Although the customer testified that the handkerchief slipped down when the robber spoke to him, he clarified that it "didn't slip all the way." Thus, the customer never had a full view of the robber's face.[15] And his attention

---

[13] Id. (citation and punctuation omitted).

[14] We note that in light of potential problems with eyewitness identification, juries may no longer consider a "witness's certainty in his/her identification as a factor to be used in deciding the reliability of that identification." *Brodes v. State*, 279 Ga. 435, 442 (614 SE2d 766) (2005) (footnote omitted).

[15] Compare, e.g., *Rutland v. State*, 296 Ga. App. 471, 475 (2) (675 SE2d 506) (2009) (no substantial likelihood of irreparable misidentification where victim had "unrestricted view" of perpetrator, stood "face-to-face" with him for three minutes,

could not have been focused solely on the robber, because he was able to describe the weapon in detail as a double barrel sawed-off shotgun approximately 19 to 20 inches in length. Additionally, immediately after the incident, the customer gave the police only an approximate height and weight estimate of the robber, with no details about any facial features.[16] At trial, he testified that this very general description was the best one he could give.[17] Critically, an entire year passed between the incident and the customer's viewing of the photo array, so his memory could not have been fresh.[18] Under these circumstances, there was a substantial likelihood of irreparable

---

paid particular attention to his facial features, and recalled that his "nostrils flared in a very distinctive manner").

[16] The majority discounts the customer's "lack of eloquence in describing the robber's facial features," supra at 12 (1) (b), but there is no evidence in the record that the customer gave *any* description of the man's facial features, ineloquent or otherwise.

[17] Compare *Price v. State*, 289 Ga. App. 763, 766 (2) (658 SE2d 382) (2008) (no substantial likelihood of irreparable misidentification where victim was able to describe assailant to sketch artist, who generated a composite sketch that was "very similar" to defendant's lineup photo).

[18] Compare, e.g., *McIvory v. State*, 268 Ga. App. 164, 168 (2) (b) (601 SE2d 481) (2004) (no substantial likelihood of misidentification where victim viewed photo array three hours after robbery).

misidentification, and the trial court abused its discretion by failing to exclude the customer's pretrial photo identification of King.[19]

3. An improper pretrial identification generally taints a subsequent in-court identification unless the in-court identification "had an independent origin" from the pretrial identification.[20] In cases in which we have found an independent origin, witnesses have testified that they knew the defendant apart from the crime or that their in-court identifications were based on their memories of the crime, not on the pretrial photo arrays.[21] There was no evidence of any independent origin here. Although the customer pointed to King in court as the person who had assaulted him,

---

[19] See *Sims v. State*, 244 Ga. App. 823, 826 (1) (537 SE2d 133) (2000) (physical precedent only) (reversing conviction based on impermissibly suggestive pretrial identification where victim did not have a good opportunity to view burglar's face and described him only in general terms that "were not particularly distinctive"); see also *Banks v. State*, 216 Ga. App. 326, 329 (3) (454 SE2d 784) (1995).

[20] *Thompson v. State*, 320 Ga. App. 46, 47 (2) (743 SE2d 24) (2013) (citation and punctuation omitted); see also *Sims*, supra; *Tiller v. State*, 222 Ga. App. 840, 841 (476 SE2d 591) (1996).

[21] See, e.g., *Thompson v. State*, 320 Ga. App. 46, 47 (2) (743 SE2d 24) (2013) (in-court identification was not tainted by pretrial photo array because witness testified that her in-court identification of defendant "was based on her familiarity with him as a neighbor and friend of her daughter over a period of years"); *Tiller v. State*, 222 Ga. App. 840, 841 (476 SE2d 591) (1996) (in-court identification had an independent origin where witness "testified that he based his identification on seeing appellant outside the apartment's laundry room, holding the television, and not on the picture of appellant he viewed after the burglary").

the customer was not asked—and did not explain—the basis for that identification. Thus, we cannot assume that the in-court identification was not tainted by the prior, impermissibly suggestive photo array.

4. Finally, the admission of the improper pretrial and in-court identifications was not harmless error. The police never found the gun used in the robbery, and there was no physical evidence linking King to the crime. Other than the customer's identifications,[22] the only other evidence against King was the testimony of a convicted felon, who hoped for a reward, that he had overheard King bragging about the crime. Moreover, King offered an alibi—multiple defense witnesses testified that he was at home hosting a neighborhood block party when the robbery occurred.

Because the trial court committed harmful error by admitting the customer's pretrial and in-court identifications of King as the robber, I would reverse King's convictions.

---

[22] One of those identifications was a voice identification that occurred after the customer was shown the photo array. But, as the majority notes, supra at 32-33 6 (c), the voice identification was the auditory equivalent of a one-on-one showup, as the customer was not presented with any other voices for a basis of comparison. See *Butler v. State*, 276 Ga. App. 161, 164 (1) (623 SE2d 132) (2005) ("a one-on-one showup is inherently suggestive") (punctuation and footnote omitted). And because the customer had already identified King through the photo array, he must have realized that it was likely King's voice he was hearing.